[Crim. No. 17453. First Dist., Div. Three. Apr. 24, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS RODNEY DAVIS, Defendant and Appellant.

[Crim. No. 17463. First Dist., Div. Three. Apr. 24, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID MAYNARD KIZER et al., Defendants and Appellants.

[Crim. No. 18007. First Dist., Div. Three. Apr. 24, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKEY ANTHONY FIELDS, Defendant and Appellant.

[Crim. No. 18036. First Dist., Div Three. Apr. 24, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ELDREDGE PAYNE GREGG, Defendant and Appellant.

[Crim. No. 18257. First Dist., Div. Three. Apr. 24, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES KHALIL BATEH, Defendant and Appellant.

[Crim. No. 18419. First Dist., Div. Three. Apr. 24, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CARTER DEAN CLAUSE, Defendant and Appellant.

**COUNSEL**

Victor D. Vertner for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SCOTT, J.**—The issue presented in these consolidated appeals is whether California statutes making unlawful the possession, possession for sale, and sale of cocaine (Health & Saf. Code, §§ 11350, 11351) deny appellants equal protection of the law, due process of the law, their right to privacy, and their right to be free from cruel and unusual punishment.[1] We conclude that those statutes have no constitutional infirmities.

All appellants except one were convicted on their pleas of guilty. They make no contention that they did not in fact violate the statutes upon which they were convicted. Their challenge is solely to the constitutionality of the statutes in question. Originally, 33 defendants charged with various cocaine crimes in Santa Clara County made the contention of the unconstitutionality of the cocaine statutes. Their motions were consolidated. Expert testimony and documentary evidence were introduced by both the defendants and the People. The Honorable Bruce Allen, Judge of the Superior Court of Santa Clara County, made extensive findings and ultimately denied the defendants' constitutional challenges. The appeals of seven of the defendants are consolidated here.[2]

The evidence produced includes the testimony offered by appellants of David Winston, former Chief Consultant for the California Assembly Committee on Health; Joel Fort, M.D., psychologist; and Dr. Ronald Siegel, psychologist and psychopharmacologist of the University of California at Los Angeles. Respondent offered the testimony of Dr. Salvatore Mule, pharmacologist, and Director and Assistant Commissioner of the New York State Office of Drug Abuse Services, Testing and Research Laboratory; and Dr. Keith Killam, Chairman of the Department of Pharmacology at the School of Medicine, University of California at Davis. Extensive documentary exhibits were received into evidence

---

[1] Appellants' contention that the punishment provided by statute for the possession, possession for sale, and sale of cocaine violates the Eighth Amendment to the United States Constitution prohibition of cruel and unusual punishment will not be considered. All of the appellants were placed on probation. Their contention of cruel and unusual punishment is addressed to the period of confinement required if they were sent to prison. Therefore, the contention is premature and must be rejected.

[2] Appellants were convicted on their guilty pleas as follows: David Kizer, Dennis Davis, Carter Clause and Eldredge Gregg—violation of Health and Safety Code section 11352 (sale of cocaine); Deborah Kizer and Rickey Fields—violation of Health and Safety Code section 11351 (possession for sale of cocaine). Charles Bateh was convicted after trial by the court of violation of Health and Safety Code section 11350 (possession of cocaine) and section 11379 (sale of phencyclidine).

and considered by the court in reaching its conclusion.[3] The wealth of information gleaned from this testimony and documentary evidence supports Judge Allen's conclusion that "cocaine is a very toxic, powerful drug that is harmful both to the user and to other people, that widespread legal availability to the public would lead to more adverse effects on society than we have now . . . ."

Judge Allen's order contains a synopsis of illicit use of cocaine in the United States, which we quote here in part:

"Cocaine is one of 14 alkaloids contained in the leaves of the coca plant, grown primarily in Bolivia and Peru. It is usually prepared as a hydrochloride salt in South America and for the illegal street market in the United States is often cut to 50% (more or less) purity with a variety of substances such as mannitol, lactose, glucose, lidocain, or procaine.

"Cocaine is a central nervous system stimulant. The Harrison Narcotic Act of 1914, which ended the legal availability of cocaine to the public, defined cocaine as a narcotic which is erroneous from a pharmacological standpoint.

"The coca leaf which contains the cocaine alkaloid and many other substances is widely used in parts of South America by chewing or

---

[3]The most current studies and reports on cocaine and its effects are:
Book entitled Licit and Illicit Drugs, The Consumers Union Report, published in 1972, consisting of 623 pages.
Book entitled Cocaine by Lester Grinspoon and James B. Bakalar, published in 1976, consisting of 308 pages.
Book entitled History of Coca by W. Golden Mortimer, M.D., published in 1974, consisting of 576 pages.
Draft of a publication of the National Institute on Drug Abuse/Alcohol, Drug Abuse and Mental Health Administration, U.S. Department of Health, Education and Welfare, dated March 1977, entitled Cocaine: 1977, consisting of 199 pages.
Paper entitled The Great Cocaine Myth by Peter G. Bourne, M.D., dated August 1974, consisting of three pages numbered 5, 6 and 7.
Transcript of Assembly Committee on Criminal Justice, Los Angeles, hearing on cocaine penalties, dated November 5, 1976, consisting of approximately 100 pages.
Paper entitled A Comparison of the Effects of Cocaine and Synthetic Central Stimulants by Nils Bejerot, dated 1970, consisting of three pages numbered 35, 36 and 37.
Paper entitled Cocaine Psychoses: A Continuum Model by Robert M. Post, M.D., dated March 1975, consisting of seven pages.
Book entitled Cocaine: Chemical, Biological, Clinical, Social and Treatment Aspects by S. J. Mule, published in 1976, consisting of 267 pages.
Numerous other books, transcripts of legislative hearings, reports to various California State Assembly and Senate Committees, and reports of other governmental and private organizations, dated during the 1950's and 1960's, regarding cocaine were also considered by the court.

sucking. The cocaine is by this method absorbed into the body through the mouth and gastric system where it is rapidly metabolized. Use of the leaf and its effects in South America are an entirely different matter from the refined substance cocaine which is illegally marketed in the United States. . . .

"Currently the price of cocaine in California is about $2,000.00 per ounce, $32,000.00 per pound on the illegal market, but is $25.00 per ounce if procured through legitimate channels from a pharmaceutical firm.

"Cocaine in the United States is used illegally primarily by snorting or sniffing. The white powder is chopped into fine particles and about 25 mg. ± is deposited in lines about an inch long and ⅛ inch wide (matchstick size), then sniffed into the nose using a straw or rolled paper. The powder is thus deposited in the mucous lining of the nose from which it is readily absorbed into the blood stream. Another common but less frequent method is to dissolve the powder in water and inject it into the blood stream. This gives more immediate results to the user and is far more hazardous. Cocaine is also combined with heroin by many users into one injection called a speedball."

Cocaine was characterized as a psychoactive drug, meaning that it alters consciousness. Such drugs are pharmacologically subcategorized into stimulants such as caffeine, nicotine, amphetamines and cocaine, and depressants such as alcohol, barbiturates, tranquilizers and heroin. Hallucinogens are another category. All experts agreed that cocaine is not a narcotic. Narcotics, which are opium or opium derivatives such as heroin, are depressant drugs which produce physical addiction and are characterized by increased tolerance with continued use and withdrawal.

Appellants' experts, Dr. Joel Fort and Dr. Ronald Siegel, offered similar testimony. They testified generally that as a stimulant, cocaine increases brain activity, blood pressure, and body temperature, causing sleeplessness, euphoria and reduced appetite. Dr. Siegel also listed among cocaine's acute effects lessened fatigue, improved attentiveness and alertness, enhanced speed of learning and increased motor activity and speed with which complex tasks might be performed. Chronic effects include rhinitis, some fatigue, hyperexcitability, blurred vision, and sexual impotency.

Though cocaine may be ingested by mouth or through injection, most cocaine users inhale it through the nose. It is generally quickly metabo-

lized by the body, with the effects lasting for approximately one-half to two hours. Both Fort and Siegel testified that, in general, cocaine users self-titrate, meaning they use only a limited amount of the drug and no more. This is because the optimum effect is produced with a specific dose and because the drug is so expensive to purchase. However, compulsive intravenous users do not self-titrate.

Dr. Fort admitted that increased availability of cocaine could lead to increased abuse. He also admitted that overdoses can lead to death, although he stated very few deaths have occurred as a result of ordinary cocaine use. In addition, some cocaine users suffer from formication—the sensation of bugs crawling under the skin. Psychosis can also occur and cocaine can be psychologically habituating. While several studies have referred to numerous case histories associating cocaine with criminal or antisocial behavior, Dr. Fort felt that none of those histories have been sufficiently substantiated.

Siegel also conceded that cocaine can be psychologically addicting, can produce formication, and has caused nose sores and occasional death. However, he testified that reported deaths resulted from the atypical intravenous use. In his studies, Siegel found no antisocial behavior resulting from cocaine use and found its abuse rare. However, he admitted many researchers disagree with his conclusions. He also stated that cocaine research is still at a beginning stage and that more research is necessary, particularly as to long-term effects of regular use.

Dr. Fort, conceding all drugs have some risk, opined that cocaine is a low risk drug and its personal use should not be made criminal. As to sale, he testified that criminal sanctions should be retained as to large sellers. He made it clear that he was not advocating cocaine use. Dr. Siegel generally agreed with Dr. Fort's conclusions that personal use of cocaine should be decriminalized and selling should remain proscribed. Like Fort, Siegel did not advocate the use of cocaine, though he deemed it a relatively safe recreational drug.

David Winston testified that in 1971 the Assembly Committee on Health was approached by the Federal Commission on Uniform State Laws for the purpose of conforming California laws regarding drug classification with the Federal Uniform Controlled Substances Act. At that time, California law classified drugs in three categories—narcotics, restricted dangerous drugs, and dangerous drugs—while the federal law used five classifications listed merely as schedules I through V (21 U.S.C. § 812). Cocaine was classified in California's pre-1972 statute as a

narcotic. When hearings were held on the proposed amendment, no evidence was taken as to cocaine use or abuse, its medical or scientific uses, or any other factors which might be relevant to classification. However, Winston had no knowledge of what evidence was previously before the state or federal Legislatures when cocaine was originally proscribed and classified. The federal classifications were adopted in California in 1972 (Health & Saf. Code, §§ 11054-11058) as part of the Uniform Controlled Substances Act. Winston testified that in his opinion the amendment was nonsubstantive and was simply one of conformity.

Respondent's expert, Dr. Salvatore Mule, testified that there are five typical characteristics of stimulants such as cocaine. They are (1) psychoactive effects which may merge into depression or paranoid psychosis; (2) strong psychological dependence which causes drug-seeking behavior; (3) acute and chronic psychotoxicity; (4) absence of physical dependence; and (5) severe and often violent, antisocial behavior during drug administration, and sometimes following drug removal. The psychotoxicity may lead to antisocial behavior of three general types: (1) distortion of perception and other psychotic effects; (2) impaired mental and physical capacity to perform perceptual-motor tasks; (3) mental aberrations, often with physical components leading to either an inability or refusal to assume individual or social responsibility. Dr. Mule further testified that from experiments he has made, he has concluded that self-titration does not take place, and that antisocial behavior, hallucination, and paranoia can result from the chronic use of cocaine.

Dr. Keith Killam agreed with Mule that cocaine can cause hallucinations, paranoia, and antisocial behavior. He also agreed that self-titration in cocaine use is unlikely because social factors, such as peer group pressures, may modify the secondary cues necessary for self-titration. Killam also stated that cocaine use can result in very powerful psychological dependence.

■ Appellants contend that the classification of cocaine with narcotics as opposed to stimulants violates the California due process and equal protection clause, article I, section 7 of the California Constitution.[4] They reason that such constitutional proscription results since cocaine possessors and sellers are subject to the penalties of the narcotics statutes proscribing their use, rather than the less harsh penalties under the statutes proscribing stimulants like amphetamines.

---

[4]Article I, section 7 of the California Constitution provides: "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws."

The legislative classification of cocaine as a narcotic is constitutional if such classification is supported by a "rational basis." (See *People* v. *Talbot* (1966) 64 Cal.2d 691 [51 Cal.Rptr. 417, 414 P.2d 633]; *People* v. *Langdon* (1959) 52 Cal.2d 425 [341 P.2d 303]; *People* v. *Jefferson* (1956) 47 Cal.2d 438 [303 P.2d 1024]; *People* v. *Ashley* (1954) 42 Cal.2d 246 [267 P.2d 271].) Appellants urge that we use the "compelling state interest" standard, and cite *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375] in support thereof. In *People* v. *Olivas* the Supreme Court held that Welfare and Institutions Code section 1731.5 violated the equal protection clauses of the federal and state Constitutions insofar as it permitted incarceration of youthful misdemeanants convicted in superior court beyond the maximum period permitted by the Penal Code for the incarceration of adults. The court rejected this result by holding that the legislative classification infringed upon a fundamental interest, that is, personal liberty, without being necessary to further a "compelling state interest." Appellants urge that here also personal liberty is infringed upon; thus we must subject the classification to strict scrutiny.

It appears, however, that the *Olivas* court did not want to increase substantially the degree of judicial supervision of the Legislature's criminal justice policies. Such a highly intrusive judicial reexamination of legislative classifications is not merited by a close reading of *Olivas*. There is language in the *Olivas* opinion that emphasizes the narrowness of the holding. For instance, the court noted that section 1731.5 was constitutionally infirm because persons committed under the statute had been "prosecuted *as adults,* adjudged by the same standards which apply to *any competent adult,* and convicted *as adults in adult courts.*" (17 Cal.3d at pp. 242-243.) This language requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor. (Cf. *Cotton* v. *Municipal Court* (1976) 59 Cal.App.3d 601 [130 Cal.Rptr. 876].)

There is ample authority that the legislative classifications involved herein have a rational basis. Substantial evidence was presented to show that cocaine is a dangerous substance on which more research, particularly as to the effects of its long-term use, is necessary. Even appellants' experts agree that the sale of cocaine should be proscribed. Therefore, the classification, even though it is not pharmacologically sound, has a rational basis and does not violate the equal protection clause.

There is no question, and respondent concedes, that as a matter of pharmacology cocaine is not a narcotic. This fact was known to the Legislature when it revised the narcotic laws in 1972. ■ The Legislature has the power to proscribe drug possession and sale and fix the penalties therefor. (See *People* v. *Aguiar* (1968) 257 Cal.App.2d 597 [65 Cal.Rptr. 171] [marijuana]; *In re Jones* (1973) 35 Cal.App.3d 531 [110 Cal.Rptr. 765] [marijuana]; *People* v. *Bowens* (1964) 229 Cal.App.2d 590 [40 Cal.Rptr. 435] [heroin].)

■ The Alaska Supreme Court in *State* v. *Erickson* (Alaska 1978) 574 P.2d 1, held that the classification of cocaine as a narcotic did not deny a defendant equal protection, due process, or his right to privacy. The Alaska Supreme Court in *Ravin* v. *State* (Alaska 1975) 537 P.2d 494, had held that the right to use and possess marijuana was protected by the Alaska Constitution's right to privacy provision. In *Erickson* the court specifically found that cocaine was more dangerous than marijuana and distinguished its *Ravin* decision on marijuana.

Federal cases are unanimous in upholding the federal statutes' classification of cocaine as a narcotic. It is on the basis of the federal classifications that the state has conformed its narcotics classifications. (*United States* v. *Solow* (5th Cir. 1978) 574 F.2d 1318, 1319-1320; *United States* v. *Wheaton* (1st Cir. 1977) 557 F.2d 275; *United States* v. *Lustig* (9th Cir. 1977) 555 F.2d 737, cert. den. (1978) 434 U.S. 1045 [54 L.Ed.2d 796, 98 S.Ct. 889]; *United States* v. *Marshall* (9th Cir. 1976) 532 F.2d 1279, 1287-1288; *United States* v. *Harper* (9th Cir. 1976) 530 F.2d 828, cert. den. (1976) 429 U.S. 820 [50 L.Ed.2d 80, 97 S.Ct. 66]; *United States* v. *Foss* (1st Cir. 1974) 501 F.2d 522, 530; *United States* v. *Smaldone* (10th Cir. 1973) 484 F.2d 311, 319-320, cert. den. (1974) 415 U.S. 915 [39 L.Ed.2d 469, 94 S.Ct. 1411]; *United States* v. *Umentum* (E.D.Wis. 1975) 401 F.Supp. 746, 748, affd. (7th Cir. 1976) 547 F.2d 987, cert. den. (1977) 430 U.S. 983 [52 L.Ed.2d 376, 97 S.Ct. 1677]; *United States* v. *Brookins* (D.N.J. 1974) 383 F.Supp. 1212, 1213-1217, affd. (3d Cir. 1975) 524 F.2d 1404.)

In an analogous situation California has approved the classification of peyote as a narcotic, although pharmacologically it is a hallucinogen. (*People* v. *Woody* (1964) 61 Cal.2d 716 [40 Cal.Rptr. 69, 394 P.2d 813].) The legislative classification of cocaine for purposes of regulation and penology does not have to mirror its pharmacological status. Even if cocaine was separately classified as a nonnarcotic, its possession and sale could be proscribed and the punishment therefor could be exactly the same as the present law provides. The Legislature has the power to

proscribe and punish cocaine possession and sale in the same manner as heroin and other narcotics since cocaine is a similarly dangerous drug. The trial court found on substantial evidence that cocaine is such a dangerous drug.

■ Appellants further contend that the classification of cocaine as a narcotic makes its proscription unconstitutional because cocaine users are denied the rehabilitative option of commitment to the California Rehabilitation Center (CRC) pursuant to Welfare and Institutions Code section 3051. Counsel for the parties in effect stipulated that a person is not a narcotic addict eligible for treatment at CRC if he is using cocaine and not any other drug or narcotic. The Legislature has determined that the CRC rehabilitation program shall be available to those who are addicted or in great danger of becoming addicted physically to a drug or narcotic. Cocaine is not physically addictive. There is a rational basis for treating heroin users and cocaine users differently for purposes of rehabilitation.

■ Appellants further contend that their constitutional right to privacy encompasses the right to use cocaine. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." This argument has been rejected elsewhere. (See *State* v. *Erickson, supra,* 574 P.2d 1.) Our Supreme Court in *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], concluded that the right of privacy was designed primarily to guard against unnecessary government snooping and collection of records. More recently, the Supreme Court in *People* v. *Privitera* (1979) 23 Cal.3d 697 [153 Cal.Rptr. 431, 591 P.2d 919], found that the proscription of the sale of laetrile did not violate the fundamental right of privacy guaranteed by the Fourteenth Amendment to the United States Constitution. The *Privitera* court reaffirmed its view of the California Constitution's right of privacy provision as being intended to protect a very limited privacy concern, that is, to prevent encroachment upon personal freedom and security caused by increased surveillance and data collection activity. It has also been held that there is no constitutionally protected right to engage in the use of euphoric drugs. (*People* v. *Aguiar, supra,* 257 Cal.App.2d 597; see also *Stanley* v. *Georgia* (1969) 394 U.S. 557, 568, fn. 11 [22 L.Ed.2d 542, 551, 89 S.Ct. 1243].)

It is clear from the evidence in the case at bench that cocaine presents a substantial threat to health and welfare. It can cause death as a direct

effect of the pharmacological action of the drug, it can lead to depression or paranoia, psychosis, hallucinations, strong psychological dependence, and severe and often violent antisocial behavior. It is questionable whether users can self-titrate. The criminalization of the personal use and possession of cocaine in the home does not constitute an invalid infringement on the right of privacy.

Judgments are affirmed.

**WHITE, P. J.**—I concur and I have concluded that Justice Scott with his customary acumen has correctly stated the *Privitera* court's view that California's right of privacy was intended "to prevent encroachment upon personal freedom and security caused by increased surveillance and data collection activity." However, I do not understand this to be necessarily Justice Scott's personally held view as to the metes and bounds of the right of privacy. It is certainly not my view. In my mind, I continue to read and understand what our Supreme Court in *White* v. *Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222]. recognized, that "the general concept of privacy relates, of course, to an enormously broad and diverse field of personal action and belief . . ." I agree with the observation of our Chief Justice in her dissent in *Privitera*, "[t]he right of privacy is a concept of as yet undetermined parameters." (23 Cal.3d at p. 711.) Manifestly, this is the case when the "legislative history" of article I, section 1 of our Constitution garnered from the election brochure argument, states in pertinent part: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose."

Actually, what we hold herein, the philosopher foretold when he admonished: "And no matter how private and unique those attitudes and values [attitudes and values at the inner core of your being] may seem to you, they are conditioned by your entanglement in the common venture." (Gardner, Morale (1978) at p. 15.)

**HALVONIK, J.**—I concur in the result but only in the result.

*People* v. *Privitera* (1979) 23 Cal.3d 697 [153 Cal.Rptr. 431, 591 P.2d 919] settles the matter and this case should be disposed of with a simple citation to it. Everything else in the majority's opinion is dicta. The

review of the trial court's "findings" is all wasted motion. If the findings were otherwise would we come to a different result? I do not see how we could but we should then at least be put to the task of fashioning proper standards for reviewing a determination of "constitutional fact." That we are not reviewing a conventional record is obvious and we should be mindful of Professor Karst's caution that, in these circumstances, "The broad generalization and the unconsidered or unexplained decision tend to substitute judicial fiat not only for the rule of a democratic majority but also for the rule of law." (Karst, *Legislative Facts in Constitutional Litigation,* 1960 Sup.Ct.Rev. 75, 75-76.) (Fns. omitted.)

Some of the majority's dicta confuses me and some of it distresses me. I am confused by the notion of "psychological addiction." What can that mean? That one will be inclined to repeat an experience that he or she enjoys? If so, can we speak of people being psychologically addicted to the music of Bach or Lester Young? How does this peculiar usage enhance our understanding of the world? And, in a free society, what is the state's interest in such things?

I am distressed by the implication in Justice Scott's opinion that the right to privacy guaranteed by article I, section 1 of the California Constitution is essentially directed at data gathering. Justice Scott, and the court in *Privitera,* cite *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222] for this proposition. *White* was a surveillance case and the court noted that the bulk of the argument contained in the election brochure circulated when the privacy amendment was submitted to the people dealt with surveillance and data gathering. But, for purposes of construing the privacy guarantee, *White* did not invite us to concentrate on the single set of facts there under consideration but to look to the brochure. (13 Cal.3d at pp. 774-775.) The argument contained in that brochure incorporates the conceptual structure of *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678] and the dissent of Justice Brandeis in *Olmstead* v. *United States* (1928) 277 U.S. 438, 471-488 [72 L.Ed. 944, 953-961, 48 S.Ct. 564, 66 A.L.R. 376]. When the brochure urged the electorate to adopt the "right to be left alone" it borrowed directly from the *Olmstead* dissent. The entire passage is worth recalling: "The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in

their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." (277 U.S. at p. 478 [72 L.Ed. at p. 956].)

"The most comprehensive of rights," it should go without saying, is profoundly concerned with more than surveillance and data gathering.