(No. 54745.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. DANNY JOE McCARTY, Appellee.

*Opinion filed September 30, 1981.*

248

Tyrone C. Fahner, Attorney General, and J. William Roberts, State's Attorney, both of Springfield (Robert J. Biderman and David E. Mannchen, of the State's Attorneys Appellate Service Commission, of counsel), for the People.

Michael B. Metnick, of Costello, Young & Metnick, of Springfield, for appellee.

Edward B. Arnolds and Gus P. Giannis, of Chicago (Michael P. Seng, of counsel), for *amici curiae* James Phelan and Brian Bowes.

MR. JUSTICE MORAN delivered the opinion of the court:

The defendant, Danny Joe McCarty, was indicted by the grand jury of Sangamon County for the unlawful delivery of less than 30 grams of a substance containing cocaine in violation of section 401(b) of the Illinois Controlled Substances Act (Act) (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b)). Prior to trial he filed a motion to dismiss the indictment alleging that the classification of cocaine as a Schedule II "narcotic drug" under section 401(b) of the Act was unconstitutional. The motion was denied. A jury found the defendant guilty as charged, and the trial court sentenced him to 3 years' imprisonment. On appeal, the appellate court found that because cocaine is neither pharmacologically nor scientifically a narcotic, its classification as such under the Act denied defendant his constitutional right to equal protection under the law. As a result the court reduced the conviction from a Class 2 felony to a Class 3 felony and remanded the cause to the trial court for resentencing. (93 Ill. App. 3d 898.) The State appeals under Supreme Court Rule 317 (73 Ill. 2d R. 317).

The State contends that there is a rational basis for the present classification of cocaine as a "narcotic drug." The defendant does not generally challenge the inclusion of cocaine in Schedule II of the Act, but, rather, claims that its designation as a narcotic therein is capricious, arbitrary and without a rational basis, thereby denying him of his right to equal protection.

The legislative purpose of the Act is set out in section 100:

"It is the intent of the General Assembly, recognizing the rising incidence in the abuse of drugs and

other dangerous substances and its resultant damage to the peace, health, and welfare of the citizens of Illinois, to provide a system of control over the distribution and use of controlled substances which will more effectively: *** (3) penalize most heavily the illicit traffickers or profiteers of controlled substances, who propagate and perpetuate the abuse of such substances with reckless disregard for its consumptive consequences upon every element of society; (4) acknowledge the functional and consequential differences between the various types of controlled substances and provide for correspondingly different degrees of control over each of the various types; (5) unify where feasible and codify the efforts of this state to conform with the regulatory systems of the Federal government and other states to establish national coordination of efforts to control the abuse of controlled substances * * *." (Ill. Rev. Stat. 1979, ch. 56½, par. 1100.)

The Act divides controlled substances into five schedules based on a descending order of potential for abuse. Substances within Schedule I have the highest potential for abuse and, therefore, call for the most severe penalties, whereas Schedule V substances have the lowest potential for abuse and correspondingly call for less severe penalties. Only Schedule II is involved in this appeal. Section 401 specifies the penalties for the manufacture or delivery of a controlled substance:

"Except as authorized by this Act, it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this Section with respect to:
***
(b) any other amount of a controlled substance [other than those amounts specified in section 401(a), i.e., less than 30 grams of any substance containing cocaine] classified in Schedules I or II which is a

*narcotic drug* is guilty of a Class 2 felony. The fine for violation of this subsection (b) shall not be more than $25,000;

(c) any other amount of a controlled substance classified in Schedule I or II *which is not a narcotic drug* is guilty of a Class 3 felony. The fine for violation of this subsection (c) shall not be more than $20,000." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 56½, pars. 1401(b), (c).)

The term "narcotic drug" is specifically defined in section 102 of the Act to include opium and opiate derivates as well as "coca leaves and any salts, compound, derivative, or preparation of coca leaves *** but not including deco-cainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine." Ill. Rev. Stat. 1979, ch. 56½, par. 1102(aa)(4).

At the pretrial hearing on defendant's motion to dismiss, the State presented no witness in opposition to the motion. Defendant presented the testimony of two expert witnesses, Dr. Joel Fort, a physician with expertise in the field of drug use and abuse, and Dr. Ronald Siegal, a psychopharmacologist and a psychologist. Both experts testified as follows. The "consensus of medical opinion" is that cocaine is not a narcotic. The characteristics of narcotic drugs are that they (1) botanically, are related to the opium poppy; (2) pharmacologically, are psychoactive depressants; (3) physiologically, are addicting, that is, they produce tolerance and withdrawal. Tolerance means that with continued use the body will require a larger amount of the drug to produce the same effect. When the drug is withdrawn from the user a "withdrawal syndrome" will occur with a variety of unpleasant symptoms.

Cocaine is not related to the opium poppy but is a substance derived from coca leaves. Unlike the narcotics which are depressants, cocaine is a central nervous system stimulant. Its short-term physiological effects include increase in heart rate and blood pressure and eye pupil

dilation. To the user it produces a euphoric state and reduces fatigue and hunger. It is not physically addictive in that it does not produce tolerance or withdrawal. Both experts were of the opinion that it does not cause hallucinations or psychosis but may cause a perceptual disorder in which a user experiences the sensation of insects crawling in or on the skin. Both experts agreed that cocaine can be psychologically addictive but felt that such dependency is seen in only 1% of users labeled "compulsive."

Cocaine is taken into the body by most users nasally by "snorting" or "sniffing." A small percentage of users (1%) inject cocaine intravenously. Both experts were of the opinion that cocaine is not generally harmful in that it is quickly and cleanly eliminated from the body. Nasal ingestion may, however, cause chronic nasal irritation, which can result in the perforation of the nasal septum. Other common side effects are irritability, insomnia and weight loss. Death can occur from a large overdose but is rare in recreational use. Cocaine has a recognized medical use as a local anesthetic.

Although both experts were of the opinion that cocaine has no causal connection to criminal behavior, both conceded that criminal activity, including violent crime, is associated with the illegal trafficking of cocaine. Dr. Fort testified that there is some divergence of opinion among experts, especially between human researchers and animal researchers, as to the dangerousness of cocaine to users. Although both experts were of the opinion that the danger of cocaine had been exaggerated, neither felt that the drug was harmless or advocated its legalization.

The defendant argues that the classification of cocaine as a Schedule II narcotic drug is invalid because it is an undisputed fact that cocaine is not medically or pharmacologically a narcotic. The defendant asks this court to reclassify cocaine as a nonnarcotic Schedule II controlled substance. The delivery of these nonnarcotic substances

may be punished as a Class 3 felony (a penalty of 2 to 5 years' imprisonment), as opposed to cocaine's present status as a Class 2 felony (a 3 to 7 years' penalty). The State contends that the medical and pharmacological definition of cocaine is not binding upon a legislative body. Moreover, the State argues that the classification of cocaine as a narcotic has a rational basis.

*People v. McCabe* (1971), 49 Ill. 2d 338, 340-41, set out the general rules for an equal protection challenge to a legislative classification:

"In determining whether a statutory classification violates the equal-protection clause, we must begin with the presumption that the classification is valid and must impose the burden of showing invalidity on the party challenging the classification. [Citations.] The equal-protection clause does not deny the States the power to classify in the exercise of their police power and it recognizes the existence of a broad latitude and discretion in classifying. [Citation.] If any state of facts may reasonably be conceived which would justify the classification, it must be upheld [citation]. The right of judicial questioning of a classification under the equal-protection clause is thus limited. As this court put it in *Thillens, Inc. v. Morey,* 11 Ill. 2d 579, 593, 'Whether the enactment is wise or unwise; whether it is based on sound economic theory; whether it is the best means to achieve the desired results, and whether the legislative discretion within its prescribed limits should be exercised in a particular manner are matters for the judgment of the legislature, and the honest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.' "

We observe initially that section 102 of the Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1102) lists and defines terms used in the Act. The term "narcotic drug" is specifically defined as including substances derived from coca leaves except those not containing cocaine or ecgonine. (Ill. Rev. Stat. 1979, ch.

56½, par. 1102(aa).) The legislature did not assume a commonly recognized meaning of the term or adopt a definition in use in scientific or medical associations. Moreover, a legislative body is not legally bound to follow previously existing definitions of terms created by persons in other fields. This is the precise reason for extensive definition of terms in an Act—to clearly delineate the exact substances proscribed. Such legislative definitions commonly create a narrower or broader meaning of terms for the purposes of the statute than would other definitions commonly used. This concept has been expressed repeatedly by other jurisdictions in a similar context. *State v. Erickson* (Alaska 1978), 574 P.2d 1, 15; *State v. Stitt* (1979), 24 Wash. App. 260, 262, 600 P.2d 671, 672; *People v. Billi* (Sup. Ct. 1977), 90 Misc. 2d 568, 395 N.Y.S.2d 353, 356.

Because of the legislature's power to redefine terms, one of defendant's basic premises is refuted. Defendant assumes that if the legislature had been aware of cocaine's medical and pharmacological properties as a nonnarcotic, its delivery would not have been classified as a Class 2 felony but, rather, would have been punished with the Schedule II nonnarcotic substances as a Class 3 felony. We do not believe this to be the case. Moreover, irrespective of cocaine's classification as a narcotic or nonnarcotic, the legislature has the power to proscribe its delivery in exactly the way it is presently proscribed. See *People v. Davis* (1979), 92 Cal. App. 3d 250, 259-60, 154 Cal. Rptr. 817, 822.

Our next inquiry is whether there is a rational basis in classifying cocaine with the opiates instead of with the amphetamines and barbiturates (Schedule II nonnarcotic substances). The State presents a number of justifications for the classification.

First, the State argues that the enormous profit from illegal cocaine traffic has led to a great deal of crime, including violent crime, as major importers and dealers compete with each other. Although defendant's experts

agreed with this contention, defendant argues that this fact is insufficient to justify the treatment of cocaine as a narcotic.

Cocaine and heroin are by far the most expensive and most profitable of the illicit drugs. As such, both heavily attract the criminal element of society. One kilogram of cocaine may cost a wholesaler from $12,000 to $20,000 but has a street value of over a million dollars. (Woods, *The Psychopharmacology of Cocaine*, 1 Drug Use in America, Problems in Perspective 116, 129-30 (1973).) Moreover, the use of cocaine has increased at an alarming rate as the drug has become regarded by users as the "high status drug." (Peterson, Statement before the Select Committee on Narcotics Abuse and Control of the House of Representatives on Cocaine 1 (1979).) It must be noted that one of the primary purposes of the Act is to "penalize most heavily the illicit traffickers or profiteers of controlled substances." (Ill. Rev. Stat. 1979, ch. 56½, par. 1100.) The State urges that these facts provide a rational basis for treating cocaine more severely than substances in Schedule II which are pharmacologically classified as nonnarcotic.

Second, the State points to the strong correlation between the use of cocaine and the use of heroin and the opiates as a rational basis for the classification. Drs. Fort and Siegel estimated that only 1% of cocaine users also use heroin. However, other studies have reported that 50% of cocaine users also regularly use heroin and that 84% of all heroin users also use cocaine. (Woods, *The Psychopharmacology of Cocaine*, 1 Drug Use in America, Problems in Perspective 116, 130 (1973).) Another study in 1977 reported that more than half of narcotic overdose deaths involved cocaine. (Welti, *Death Caused by Recreational Cocaine Use*, 24 J.A.M.A. 2519 (1979).) Although there is a great disparity in the opinions of experts as to the relationship between the use of heroin and the use of cocaine, some percentage of crossover is apparent.

Third, the State points to the potential for harm inherent in the illegal use of cocaine as providing a rational basis for its classification as a narcotic for penalty purposes.

Defendant's experts admit that there is a great divergence of opinion among experts on the potential for harm inherent in the use of cocaine. Animal studies are cited by the State which indicate that the use of cocaine causes a high degree of psychological dependence and tolerance. (Deneau, *Self Administration of Psychoactive Substances by the Monkey, a Measure of Psychological Dependence,* 16 Pharamcologia 30-48 (1969); Matsuzaki, *Effects of Cocaine on the Electrical Activity of the Brain and Cardiorespiratory Functions and the Development of Tolerance in the Central Nervous System,* in S.J. Mule, Cocaine: Chemical, Biological, Clinical, Social and Treatment Aspects 149-162 (1976); Post, *Clinical Aspects of Cocaine: Assessment of Acute and Chronic Effects in Animals and Man,"* in S.J. Mule, Cocaine: Chemical, Biological, Clinical, Social and Treatment Aspects 203 (1976).) Other studies involving humans are cited by the State to show that the use of cocaine may cause depression, nervousness, fatigue, sleepiness, hunger, hallucinations, psychosis, psychological dependence and even death. The 1979 issue of the Journal of the American Medical Association states:

"This report again demonstrates that cocaine cannot be regarded as a safe recreational drug despite current belief and legal controversy." Welti, *Death Caused by Recreational Cocaine Use,* 24 J.A.M.A. 2519, 2522 (1979).

The State also points to the danger inherent in the increase in the practice of smoking coca paste or freebase cocaine. Coca paste is an extraction product made during the manufacture of cocaine from the leaves of the coca bush. The leaves are mashed, and alkali, kerosene and sulfuric acid are added. The white paste is usually sprinkled on tobacco or marijuana and is smoked. Smoking this high

potency cocaine sulfate is the equivalent of intravenous injection. Reportedly, such use frequently results in an obsession with coca paste smoking, the appearance of psychotic reactions and paranoid states. (Cohen, *Coca Paste and Freebase: New Fashions in Cocaine Use,* 9 Drug Abuse and Alcoholism Newsletter, No. 3 (1980).) Freebase cocaine is ordinarily made by the user by dissolving the impure cocaine powder in water, adding a strong alkali and extracting the basic cocaine with a volatile solvent. These caustic and volatile chemicals frequently cause home accidents. When this "freebase" is smoked, it reportedly evokes an enormous desire to keep "basing." The effect is identical to intravenous use. "Manic, paranoid or depressive psychosis have been seen. Overdoses can cause death due to cardiorespiratory arrest." Cohen, *Coca Paste and Freebase: New Fashions in Cocaine Use,* 9 Drug Abuse and Alcoholism Newsletter, No. 3 (1980). See Jeri, *The Syndrome of Coca Paste,* 10 (4) Journal of Psychedelic Drugs 361 (1978); Daltry, *Freebase: Can You Smoke Cocaine Without Getting Burnt?,* Grassroots Stimulants 7 (1980).

The State additionally argues that the ongoing dispute in the scientific and medical community as to the potential harm inherent in the use of cocaine and the abundance of unresolved questions concerning the effect of cocaine on humans provide a rational basis for its present statutory classification.

We conclude that the reasons presented by the State provide a rational basis to validate the legislature's judgment to classify cocaine with "true" narcotic substances for the purpose of penalty.

We are mindful of the fact that section 100 of the Act has as one of its stated purposes to "unify where feasible and codify the efforts of this state to conform with the regulatory systems of the Federal government and other states to establish national coordination of efforts to control the abuse of controlled substances." (Ill. Rev. Stat. 1979, ch.

258

56½, par. 1100.) Under the Federal Controlled Substances Act (21 U.S.C. §801 *et seq.*), cocaine is listed as a narcotic drug, along with the opiates, for penalty purposes. It is also treated as a "narcotic drug" by the Uniform Narcotic Drug Act, which has been adopted by the great majority of State legislatures. Moreover, our research has revealed that all courts which have dealt with the identical issue, with the exception of one trial court in the State of Michigan, have upheld the classification of cocaine as a "narcotic" for penalty purposes. *State v. Bonanno* (La. 1980), 384 So. 2d 355; *People v. Davis* (1979), 92 Cal. App. 3d 250, 154 Cal. Rptr. 817; *State v. Stitt* (1979), 24 Wash. App. 260, 600 P.2d 671; *State v. Vernon* (Minn. 1979), 283 N.W.2d 516; *State v. Erickson* (Alaska 1978), 574 P.2d 1; *People v. Billi* (Sup. Ct. 1977), 90 Misc. 2d 568, 395 N.Y.S.2d 353; *Canal Zone v. Davis* (5th Cir. 1979), 592 F.2d 887; *United States v. Stieren* (8th Cir. 1979), 608 F.2d 1135; *United States v. Vila* (2d Cir. 1979), 599 F.2d 21, *cert. denied* (1979), 444 U.S. 837, 62 L. Ed. 2d 48, 100 S. Ct. 73; *United States v. Solow* (5th Cir. 1978), 574 F.2d 1318; *United States v. Lane* (10th Cir. 1978), 574 F.2d 1019; *United States v. Wheaton* (1st Cir. 1977), 557 F.2d 275; *United States v. McCormick* (4th Cir. 1977), 565 F.2d 286; *United States v. Lustig* (9th Cir. 1977), 555 F.2d 737, *cert. denied* (1978), 434 U.S. 1045, 54 L. Ed. 2d 795, 98 S. Ct. 889; *United States v. Marshall* (9th Cir. 1976), 532 F.2d 1279, 1287-88; *United States v. Harper* (9th Cir. 1976), 530 F.2d 828, *cert. denied* (1976), 429 U.S. 820, 50 L. Ed. 2d 80, 97 S. Ct. 66; *United States v. Foss* (1st Cir. 1974), 501 F.2d 522, 530; *United States v. Smaldone* (10th Cir. 1973), 484 F.2d 311, 319-20, *cert. denied* (1974), 415 U.S. 915, 39 L. Ed. 2d 469, 94 S. Ct. 1411; *United States v. Umentum* (E.D. Wis. 1975), 401 F. Supp. 746, 748, *aff'd* (7th Cir. 1976), 547 F.2d 987, *cert. denied* (1977), 430 U.S. 983, 52 L. Ed. 2d 376, 97 S. Ct. 1677; *United States v. Brookins* (D.N.J. 1974), 383 F. Supp. 1212, 1213-17, *aff'd* (3d Cir. 1975), 524 F.2d 1404.

Contra *People v. Harman*, No. 79—2584FY (44th Cir. Mich. April 20, 1981).

The defendant argues that this court's decision in *People v. McCabe* (1971), 49 Ill. 2d 338, requires that the cocaine classification be declared unconstitutional as a violation of his right to equal protection. In *McCabe*, this court held that the inclusion of marijuana under the Narcotic Drug Act rather than under the Drug Abuse Control Act was a deprivation of due process and equal protection. There, a defendant's first conviction for the sale of marijuana was punishable under the Narcotic Drug Act by a mandatory 10-year minimum sentence without the possibility of probation. Drugs named in the Drug Abuse Control Act, which had properties similar to that of marijuana, subjected a first-time offender convicted of the sale of such drugs to a maximum jail term of one year. Probation was also available. Of significance is the fact that, while the defendant's conviction was pending on appeal, the legislature removed marijuana from the Narcotic Drug Act and reclassified it under the newly enacted Cannabis Control Act. As a result of the latter, only minor criminal penalties were imposed upon a defendant first convicted of the sale of marijuana. In light of these facts, the court ruled that the gross disparity between the penalties violated the defendant's rights under the equal protection clause.

However, in the present case, no gross disparity of penalty is present nor has the legislature made any attempt to reclassify cocaine or to reduce the penalties attached thereto. A person found guilty of delivery of a small amount of a Schedule II narcotic drug under section 401(b) of the Act is subject to a penalty of 3 to 7 years' imprisonment, whereas a person found guilty of the delivery of a small amount of a Schedule II nonnarcotic drug is subject to a penalty of 2 to 5 years' imprisonment. We therefore find *McCabe* distinguishable from the present case.

For the reasons stated, we reverse the judgment of the appellate court and affirm the judgment of the circuit court of Sangamon County.

*Appellate court reversed;*
*circuit court affirmed.*