UNITED STATES, Appellee,

v.

Dean H. ETTLESON, Airman First Class,
U. S. Air Force, Appellant.

No. 38,060.

ACM 22480.

U. S. Court of Military Appeals.

July 26, 1982.

For Appellant: *Captain Patrick A. Tucker* (argued); *Colonel Larry G. Stephens* (on brief).

For Appellee: *Captain Richard O. Ely, II* (argued); *Colonel James P. Porter, Captain James R. Van Orsdol* (on brief); *Captain William O. Ashcraft* (a law student at Southern Methodist University).

## Opinion of the Court

EVERETT, Chief Judge:

Notwithstanding his pleas of not guilty, a general court-martial sitting at Williams Air Force Base, Arizona, convicted appellant of having transferred lysergic acid diethylamide (LSD) and of having transferred a habit-forming narcotic drug, to wit, cocaine, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934, respectively. Appellant was sentenced to a dishonorable discharge, confinement at hard labor for 4 years, and reduction to the lowest enlisted grade. However, the convening authority disapproved the LSD conviction and, accordingly, approved a sentence extending only to a bad-conduct discharge, confinement at hard labor for 15 months, forfeiture of $150 pay per month for 15 months, and reduction to the lowest enlisted grade. The United States Air Force Court of Military Review affirmed in an unpublished opinion.

In this Court, appellant successfully applied for review of his case on three separate allegations of error: (1) Whether the cocaine at issue should not have been admitted against him because of the Government's failure to establish a complete chain of custody; (2) whether the military judge erred when he denied appellant's request for individual military counsel; and (3) whether appellant was denied his right to have a material witness called in his behalf during both the findings and the sentencing stages of the trial. In addition, we specified the following issue for review:

WHETHER IN A PROSECUTION FOR TRANSFER OF A HABIT-FORMING NARCOTIC DRUG, TO-WIT: COCAINE, AS A DISORDER OR NEGLECT, AS OPPOSED TO A NONCAPITAL CRIME OR OFFENSE, UNDER ARTICLE 134, CONGRESSIONAL CLASSIFICATION OF COCAINE AS [A] HABIT-FORMING NARCOTIC DRUG IS DETERMINATIVE THEREOF AS A MATTER OF LAW, OR IS MERELY EVIDENCE THEREOF AS A MATTER OF FACT.

After considering the arguments and the extensive briefs, we decide all issues against appellant.

## I

### Chain of Custody

When the Government sought to introduce into evidence prosecution exhibit 2, the cocaine allegedly sold by appellant to an Airman Cook in a controlled buy, defense counsel objected on the ground that the Government had failed to establish a proper and complete chain of custody of the substance. Specifically, counsel contended that no evidence connected its possession by Special Agent Pollard of the Air Force Office of Special Investigations (OSI), who received it from Cook, and its alleged possession by Special Agent Hulslander, the evidence custodian.

Pollard testified that he had received the exhibit from Cook on September 14, 1978. Furthermore, he revealed that generally when such evidence is received, it is recorded in an evidence log and placed in an evidence locker—although he failed to testify specifically what he had done with that particular exhibit on that occasion. While he did identify Hulslander as the evidence custodian for this OSI detachment, Pollard never expressly claimed to have delivered the cocaine to Hulslander after receiving it from Cook.

When Hulslander himself appeared as a witness, he testified that prosecution exhibit 2 came into his possession on September 14, 1978; that he recorded it in the evidence log; and that he then placed it in the evidence locker. However, he failed to say specifically from whom he received it, although he did echo Pollard's testimony that normally an agent who picked up evidence during an investigation would turn it over to Hulslander, the evidence custodian.

Nevertheless, the strong, uncontroverted inference is that Hulslander received

the exhibit directly from Pollard. *See United States v. Parker*, 10 M.J. 415 (C.M.A.1981). Pollard's testimony, as well as that of Hulslander, established that this would have been the usual route for such evidence. The date on which Pollard received the exhibit from Cook coincided with that on which it came into the possession of Hulslander, who testified that he had followed the same procedure with prosecution exhibit 2 as he did with prosecution exhibit 1 (the LSD which had formed the basis for the first charge). Just moments earlier Hulslander had testified that he had received prosecution exhibit 1 from Agent Pollard. Moreover, Pollard had field-tested the substance received from Cook as soon as he had returned to his office with it; from the test he had concluded that it was cocaine—this conclusion being the same as that reached subsequently by the crime laboratory as to the nature of prosecution exhibit 2. *See United States v. Fowler*, 9 M.J. 149 (C.M.A.1980).

Accordingly, on the basis of the inference reasonably drawn from the testimony of Agents Pollard and Hulslander and the identical conclusions reached by a field-test of the substance seized and by the laboratory test of prosecution exhibit 2—and in the absence of any real suggestion of tampering—the military judge's determination that the chain of custody had been adequately established is supported by credible evidence. *See United States v. Porter*, 12 M.J. 129 (C.M.A.1981); *United States v. Madela*, 12 M.J. 118 (C.M.A.1981); *United States v. Lewis*, 11 M.J. 188, 192–93 (C.M.A.1981); *United States v. Fowler, supra. Cf. United States v. Ortiz*, 12 M.J. 136 (C.M.A.1981). Therefore, the military judge correctly denied the defense objection based on the perceived absence of a link between Pollard and Hulslander.

## II

### *Individual Defense Counsel*

#### A

At an Article 39(a) session [1] on November 13, appellant advised the military judge that he desired to be represented by Captain Rowland of another installation, Luke Air Force Base, Arizona, and that he was awaiting an answer to a request he had made to that effect. He further indicated that if this request was denied, he would submit a request for another "independent defense counsel, someone whom I'm thinking of now, and in the meantime I would like to retain Captain Anthony [the detailed defense counsel] as my defense counsel."

A short time later, in the same session, the military judge indicated some confusion about the status of appellant's counsel request; he inquired of Captain Anthony as to exactly what that status was and what the defense was seeking then from the court. Captain Anthony responded that the defense wished a continuance to pursue appellant's desire that Captain Rowland represent him. Moreover, Captain Anthony revealed that the initial request for Captain Rowland had been made on October 27; that the message from the convening authority to Captain Rowland's command inquiring about his availability had been received by that command on November 6; and that on the same date the staff judge advocate at Luke Air Force Base had responded that Captain Rowland was not available to serve as appellant's individual defense counsel. In his message the staff judge advocate explained that, by reason of an out-of-cycle base reassignment, Captain Rowland would be departing Luke on December 15. Furthermore, on November 14, Rowland was scheduled to represent the Base at a local hearing on pesticides; on November 20, he was to represent Luke Air Force Base "in preparation of an environmental memorandum of understanding"; and on November 21, he would be attending a zoning hearing of the local County Board of Supervisors on a matter which affected the Base. The message concluded:

Due to the recent separation of two experienced captains and the imminent departure of Capt Rowland, it would place a

---

1. Article 39(a), Uniform Code of Military Justice, 10 U.S.C. § 839(a).

crippling burden on my office if Capt Rowland were required to assume IDC duties.

Captain Anthony advised the military judge that the defense fully appreciated the difficulties presented for Captain Rowland's command by his scheduled departure, but that the defense, nonetheless, intended to appeal the adverse determination to the next higher command. Concurrently, the defense planned to request alternative individual counsel by name if the appeal was denied. However, Captain Anthony assured the trial judge that the defense did not wish "to interminably delay these proceedings" but only was trying to obtain a defense counsel with more defense experience than Anthony possessed—and in whom, therefore, appellant would have more confidence. Finally, the judge continued the proceedings until December 5.

By letter dated November 17, Captain Anthony did, in fact, appeal the determination of Captain Rowland's unavailability. In doing so, he stated in part:

Sir, A1C Ettleson's trial is scheduled for 5 December at Williams AFB which is only a 1½ hour drive from Luke AFB. Captain Rowland is now scheduled to depart PCS [permanent change of station] in January 1979.[2] His replacement has already visited the Luke AFB Staff Judge Advocate's Office, lives in the local area, and is scheduled to begin his duties at the end of November 1978; and he is an experienced judge advocate (over four years) who should require minimum orientation. Captain Rowland's forecast duties include a few meetings of importance in November, but I respectfully suggest that his daily responsibilities do not take precedence over a request for him to serve as IDC at a General Court-Martial.

On November 20, the appeal was sustained, and Captain Anthony was notified that the appropriate commander had determined that Captain Rowland was available to serve as appellant's individual defense counsel. However, two days later, the staff judge advocate at Luke Air Force Base advised Captain Anthony that this initial decision had been altered and that subsequently it had been determined that Captain Rowland, in fact, was not available for the requested defense duties. On November 30, the commander confirmed in writing his denial of the appeal and explained his decision in this way:

I have carefully considered your request that Capt Jay A. Rowland, 58 CSG/JA, be made available to act as defense counsel in the case of the United States versus A1C Dean H. Ettleson. Capt Rowland has been instrumental in the implementation of the Air Installation Compatible Use Zone (AICUZ) around Luke AFB. For three years he has been working with the legislature, the county, and the cities to have zoning compatible with the operation of military aircraft at Luke AFB. On 20 Nov 78, I decided that Capt Rowland could be released from his normal duties to be A1C Ettleson's defense counsel. On 21 Nov, the Maricopa County Planning and Zoning Commission forwarded the zoning ordinance to the Maricopa County Board of Supervisors. These were the "meetings of importance in November" that you recognized in your letter of 17 Nov 78. The Board of Supervisors has scheduled the public hearing on the zoning ordinance for 4 Dec 78. This hearing represents the culmination of years of work. Capt Rowland is required to prepare the presentation of our position on the ordinance and is required to attend the hearing. There is no one with the background and knowledge of Capt Rowland capable of performing this task. After learning of this scheduled meeting, I reevaluated my decision and must conclude that he is not available to act as defense counsel for A1C Ettleson.

2. The record reflects that subsequent to the initial Article 39(a) session, Captain Rowland's departure date from Luke AFB had been pushed back to mid-January, instead of December 15.

When the military judge reconvened the Article 39(a) session on December 5, he was apprised of all these developments. Captain Anthony supplemented this information with news that the December 4 meeting had taken place as scheduled, but that the vote of the Board of Supervisors on the zoning ordinance had been delayed until December 11. Also, Captain Anthony advised the judge that, while preparing his formal appeal after the earlier Article 39(a) session, he simultaneously had pursued other individual defense counsel—even though, it would appear, with little hope of success. A possibility had existed that a Captain Anderson—then a Circuit Trial Counsel— might have been available to defend appellant; but, upon hearing on November 20 that Captain Rowland had been made available, Captain Anthony advised Anderson's office that his services were no longer required. Then, after learning on November 22 of the renewed determination that Captain Rowland was unavailable, Captain Anthony again contacted Captain Anderson; but he discovered that, in the meantime, the latter's trial calendar had been filled for the time period in question. Thereafter, on November 27, Captain Anthony, after discussing the matter with appellant, terminated any further efforts to locate available individual defense counsel in the interest of spending the time, instead, in preparing for trial.

Captain Anthony also revealed to the military judge:

When it occurred to me that Captain Rowland's experience might be desirable to the accused, I arranged a meeting between the accused and Captain Rowland. This was before the first request for Individual Defense Counsel was submitted. They met at my office at Luke Air Force Base, in the library, and were allowed to be alone. And as best I can remember, and as Captain Rowland can remember, it was a 10 or 15 minute meeting. The express purpose of that meeting was for the accused to get to know Captain Rowland. I did not hear what transpired but I understand that there was a general discussion of Captain Rowland's experi-

ence, his background, his father who was also a Judge Advocate, his background, and the discussion of some of the theories of the defense of the case. Without a discussion of . . . . without eliciting any facts from the accused regarding the case. When I again entered the room Captain Rowland did make a few suggestions to me on things that might be pursued and that's, to the best of my understanding, the extent of the communications with Captain Rowland concerning the case.

After a short recess to consider Captain Anthony's motion for the court to order that Captain Rowland be made available as appellant's individual defense counsel, the military judge ruled:

With regard to the accused's request for Captain Jay A. Rowland as Individual Request [sic] Counsel this court finds that: 1) Captain Rowland has never entered into an Attorney Client relationship with the accused; 2) The 58th Combat Support Group Commander's initial determination of non-availability was based on sound operational considerations and was not arbitrary, capricious or unreasonable; 3) That the accused suffered no prejudice as a result of Colonel John L. Pickitt's actions in initially making Captain Rowland available and thereafter reversing himself and declaring him as not reasonably available; and 4) That Colonel Pickitt's determination of non-availability made on 22 November 1978 was based on sound operational considerations and was not arbitrary, capricious or unreasonable. It is, therefore, the ruling of this court that defense counsel's request that Colonel Pickitt's final determination of non-availability be overruled, and the request that he be required to detail Captain Rowland as Individual Counsel in the case now in hearing is denied.

Thereafter, the trial proceeded with Captain Anthony representing appellant—although the military judge, after having denied the defense motion for Captain Rowland, never expressly asked appellant whether he then wished Captain Anthony

to assume full responsibility for the defense.

## B

At the time of trial, Article 38(b) of the Code, 10 U.S.C. § 838(b), gave to a military accused the right to be represented in a court-martial by "military counsel of his own selection *if reasonably available*" (emphasis supplied); but it did not prescribe any criteria for determining when a requested counsel was "reasonably available."[3] Likewise, at that time the Manual for Courts-Martial offered no guidance. Nonetheless, several decisions of this Court had fleshed out this standard by addressing various situations in which an accused had been denied the services of a requested lawyer for his defense.

Our precedents established that there must be "a sound reason for denying to the accused the services of the representative whom he seeks." *United States v. Cutting*, 14 U.S.C.M.A. 347, 351, 34 C.M.R. 127, 131 (1964). *Accord, United States v. Quinones*, 1 M.J. 64 (C.M.A.1975). However, as Article 38(b) itself makes clear, the

> accused's own selection is not an absolute right granted him, but is subject to the exigencies and practicalities of whatever situation may obtain at the time. Of course, the right to choose counsel in the first instance may not be insisted on in such a manner as to obstruct either other important operations of the service concerned or the orderly administration of military justice.

*United States v. Vanderpool*, 4 U.S.C.M.A. 561, 565–66, 16 C.M.R. 135, 139–40 (1954).

In accordance with the view we expressed in *United States v. Cutting, supra* at 352, 34 C.M.R. at 132, that Congress did not intend for Article 38(b) to be given "grudging application," this Court must apply broadly the statutory right to individual military counsel. *United States v. Kelker*, 4 M.J. 323 (C.M.A.1978). Nevertheless, we conclude here that sound reasons existed for denying appellant the services of Captain Rowland.[4] *See United States v. Cutting, supra.* It is quite apparent that Captain Rowland's unique services were required by his own command throughout the period of time in November during which preparation for the defense of appellant was to proceed. Nonetheless, Captain Rowland's command still was willing to free him for the trial until it was advised that hearings and action by the Board of Supervisors were imminent. Instead of displaying a "cavalier on-again, off-again response to the appellant's request for individual counsel," as appellate defense counsel have characterized this situation, the events here reflect a sincere effort by that command—even considering Captain Rowland's other heavy workload, *see United States v. Quinones, supra*—to free him to serve appellant, if at all possible. *See* para. 48*b*, Manual for Courts-Martial, United States, 1969 (Revised edition). That this goal ultimately proved unattainable is attributable more to unforeseen circumstances than to an insensitive command attitude. Moreover, if, as Captain Anthony implied, the intervening grant of appellant's counsel request on November 20 had resulted in the loss of the possible services of Captain Anderson,[5] the

3. Article 38(b), UCMJ, 10 U.S.C. § 838(b), was amended on November 20, 1981—effective 60 days thereafter—to provide that reasonable availability would be determined under Secretarial regulations which "[t]o the maximum extent practicable . . . shall establish uniform policies among the armed forces while recognizing the differences in the circumstances and needs of the various armed forces." Military Justice Amendments of 1981, Pub.L.No.97–81, § 4(b)(7), 97th Cong., 1st Sess., 95 Stat. 1088.

4. We address the denial of Captain Rowland's services as a denial of a request for individual counsel, rather than as a breach of an existing

attorney-client relationship—for the evidence of record amply supports the trial judge's ruling that such a relationship had not been created.

5. It is not clear, however, whether Captain Anderson, who was serving as a Circuit Trial Counsel, ever would have been made available to serve appellant's defense. A change to Air Force policy in October 1976 precluded a Circuit Trial Counsel from being made available as a defense counsel. Para. 13–15*b*, AFM 111–1(C2, October 8, 1976). This change undoubtedly resulted from a decision earlier that year by the Air Force Court of Military Review that

logical remedy would seem to have been to request a further continuance in the hope of obtaining either Captain Rowland or Captain Anderson as individual defense counsel; but no such request was forthcoming from the defense.

Appellant argues that, even if Captain Rowland were not reasonably available because of the scheduled December 4 meeting, that *ratio decidendi* for the denial of his services had evaporated as of December 5—the date of the second Article 39(a) session. However, this contention ignores the representation by Captain Anthony himself that the Board of Supervisors had postponed action on the critical zoning ordinance until December 11. In light of Captain Rowland's intimate professional involvement in this project for several years, it certainly was not unreasonable for his command to desire his presence at that session of the Board, so that his expertise would be readily available in the command's interest. Further, as Captain Rowland's involvement in this case had been minimal up to that point, he probably would not have been prepared to undertake appellant's defense without additional time, and, as already pointed out, on no occasion did appellant request a further continuance from the trial judge for that purpose.

Finally, appellant submits that "because the military judge failed to determine by whom the appellant wished to be defended, after his request for Captain Rowland was denied by the military judge, it is highly possible that the appellant was unaware that he could, at that time, request representation by another military attorney as individual counsel." Even apart from the fact that at the second Article 39(a) session Captain Anthony represented to the court that other counsel were virtually unavailable, we have no doubt that appellant was fully aware of his right to pursue other individual counsel. Indeed, Ettleson himself indicated to the military judge at the outset of the first Article 39(a) session that,

if he failed in his appeal of the denial of Captain Rowland's services, he intended to submit a request for other named counsel.

Under these circumstances, denial of Captain Rowland as appellant's individual defense counsel was appropriate and the military judge's denial of his motion for relief was proper.

## III

### Treatment of Cocaine

#### A

Prior to trial, defense counsel asked the convening authority to employ Andrew M. Weil, M.D., as an expert defense witness, under the provisions of paragraph 116, Manual, *supra*. *See also* para. 115, *id.* The request was denied; and when defense counsel requested reconsideration, the denial was affirmed.

At trial, defense counsel renewed the request before the military judge and noted that Ettleson had been charged under Article 134 for allegedly transferring "a habit-forming narcotic drug, to wit: .5 gram of cocaine." Therefore, claimed the defense, the "habit-forming, narcotic" nature of cocaine had been placed in issue by appellant's not-guilty plea; so it had to be proved by the prosecution as did any other factual element of the offense. Defense counsel urged that Dr. Weil was a necessary witness who would offer expert testimony concerning the nature of cocaine—a matter of importance not only as to the findings but also, if appellant were convicted, as to an appropriate sentence.

Dr. Weil's qualifications as an expert were undisputed and his expected testimony was established. As to the allegation that appellant had transferred "a habit-forming narcotic drug, to wit: .5 gram of cocaine," Dr. Weil would have testified on the merits that cocaine is not a narcotic, nor is it any more habit-forming than coffee or

"the judicial responsibilities of circuit trial counsel should preclude their employment as defense counsel." *United States v. Brown*, 2 M.J. 627, 628 (A.F.C.M.R.1976) (footnote omit-

ted), *rev'd. on other grounds*, 3 M.J. 368 (C.M. A.1977). *See also United States v. Rachels*, 6 M.J. 232 (C.M.A.1979).

tobacco. Concerning an appropriate sentence if appellant were convicted, Dr. Weil would have stated that cocaine is less dangerous medically than alcohol; that there is less danger of becoming dependent on cocaine than on alcohol or tobacco; and that cocaine, as commonly used in the United States, does not constitute a serious danger to the physical or mental health of individuals or of society.[6]

In reply, trial counsel advanced the prosecution's view that the nature of cocaine as a "habit-forming narcotic" had been established as a matter of law by Congress. To that end, he requested that the judge take judicial notice of certain federal statutes.[7]

The defense responded that the definitions and classifications of drugs relied on by trial counsel were pertinent only to the particular statutes in which they were contained and they neither had, nor purported to have, any relevance to the Uniform Code of Military Justice and the trial of courts-martial. "Therefore," as the defense counsel summed up, "it is the defense position that whether or not cocaine is a habit-forming drug is a fact issue that must be proven by the government. Dr. Weil is very well qualified ... to testify about this matter."

After a short recess, the military judge rendered this rather confusing ruling:

MJ: As requested by trial counsel, this Court takes judicial notice of the following sections of the United States Code and the Code of Federal Regulations: 1) Title 41 U.S.C. Section 201.

TC: Excuse me, Your Honor, Title 41 or 42?

MJ: Correction, Title 42, U.S.[C.] Section 201. Title 21, U.S.C. Section 802, Title 21, U.S.C. Section 812, and Section 1308.-12 of the Code of Federal Regulations. This Court further takes *judicial notice of the fact, and it has determined as a matter of law* that cocaine is for the purposes of this proceeding a "habit-forming nar-

cotic drug," whose transfer is prohibited by Article 134 [of] the Uniform Code of Military Justice. Consequently, it is the finding of this Court that *the testimony of Dr Andrew T. Weil* as set forth in his affidavit contained in Appellate Exhibit XII, *would not be relevant* to these proceedings. *Either in the case in chief or in the pre-sentencing procedure,* should the accused be convicted of Charge II and the Specification thereunder. Therefore, defense counsel's request that I order the government to call Dr Weil as an expert witness is denied. *If however, the accused is convicted* of Charge II and the Specification thereunder *this Court will if requested by the defense instruct the members* that while cocaine has been classified as a "habit-forming narcotic" by the United States Congress and is considered as such within the context of the Military Law there is very considerable medical evidence to the effect that it is not physiologically addictive. Should defense counsel desire such an instruction, the Court would request that it be submitted in writing at the appropriate time and that a copy be furnished trial counsel for his examination. Incidentally counsel, it could within reason contain almost *all of the information set forth in Dr Weil's affidavit* in so long as it's in substantial compliance with existing law. That is, concerning the effect of cocaine on an individual. Do you have any questions?

DC: Yes, Your Honor. I don't understand what you mean by the last statement?

MJ: Well I think it's recognized by all legal authorities that while cocaine has been classified by the Congress as a habit-forming narcotic drug that perhaps that term is misleading. So if you will come up with what you consider to be a meaningful instruction to the Court, setting forth what in fact the physical and

---

6. This testimony would have been based on several years of research and study under license of the Federal Drug Enforcement Administration, including experimentation on human subjects.

7. 21 U.S.C. §§ 802(16) and 812 and 42 U.S.C. § 201(j) were the statutory provisions which trial counsel brought to the judge's attention.

physiological impact of the drug is on human beings as set forth in Dr Weil's affidavit, I would be favorably disposed to give those instructions to the Court and advise them in substance that, as Dr Weil's affidavit indicates, that it is, as an example, no more addictive, or whatever term you might want to use, than is alcohol or tobacco. Is that sufficiently clear?

DC: Yes, Your Honor.

MJ: *And I will give it in the form of an instruction which then would not necessitate, and open the door, because I don't think it's even relevant to these proceedings, a great deal of evidence concerning the use of it.* It seems to me it is fairly conceded by most of the legal authorities, or legal scholars, that there is a vast difference between cocaine and morphine for example. And if you can come up with an instruction that you feel would convey that message clearly to the court members I will be favorably disposed to give that instruction.

DC: Thank you, Your Honor.

MJ: Does the trial counsel have any comment on that?

TC: Yes, Your Honor. Trial counsel would request that this evidence if presented to the jury be in the form of expected testimony from Dr Weil as opposed to an instruction from the Court. Trial counsel feels that the Court's position might be given undue emphasis to the matter.

MJ: If the government and the defense can reach an agreeable stipulation as to Dr Weil's testimony, I would have no objection to permitting that to go [to] the court-members; however, I will leave that to the discretion of the defense counsel. I can handle it either way. It doesn't make any difference. But *I do feel that it's only fair to the accused that the Court be apprised of the fact that the legal significance of classifying the drug as a narcotic habit-forming drug, does not in and of itself mean that the drug is the same for example as morphine. But I think it's reasonable to inform the Court that there are varying degrees and this is*

what I will permit. And if you choose to present it in the form of a stipulated testimony that's fine with me.

DC: Defense would prefer the instruction.

MJ: Very well.

(Emphasis supplied).

At the close of the trial on the merits, the following advice was included in the judge's instructions intended to guide the court members to a proper verdict:

The court is advised that to find the accused guilty of this offense it must be satisfied by legal and competent evidence beyond a reasonable doubt, a) That at the time and place alleged the accused transferred a habit-forming narcotic drug to wit: cocaine, b) That such transfer by the accused was wrongful and c) That under the circumstances the conduct of the accused was to the prejudice of good order and discipline in the Armed Forces, or was of a nature to bring discredit upon the Armed Forces.

The court is advised that the transfer of a habit-forming narcotic drug may be found to be wrongful unless the contrary appears. You are advised that in order to find the accused guilty of the offense charged *you must find beyond a reasonable doubt* not only that he transferred a certain substance as alleged, but also *that it was in fact a habit-forming narcotic drug.* In this connection the court is advised that the term "narcotic drug" includes cocaine or any salt, derivative, compound, or preparation thereof. The court is further advised that it has, during the course of this trial, *taken judicial notice of the fact that cocaine is a habit-forming narcotic drug* whose wrongful transfer is prohibited by Article 134 of the Uniform Code of Military Justice. A certain kind of fact need not be proved by formal presentation of evidence, for the court is authorized to recognize their existence without such proof. This recognition by the court is termed "judicial notice."

(Emphasis supplied).

Then, after findings, the military judge gave the court members these instruc-

tions—which had been requested by defense counsel pursuant to the judge's earlier invitation:

> The court is advised that although for purposes of charging the accused and determining the maximum limits of his punishment cocaine is legally classified as a habit-forming narcotic, that classification is not universally accepted within the medical and scientific communities. In this regard you are advised that there is considerable medical and scientific opinion to the affect [sic] that:
>
> 1. Cocaine is not a narcotic drug. It is a stimulant and local anesthetic derived from the coca leaf. Its chemistry and pharmacology are completely unlike those of heroin and other opiates which are all depressants. There is no scientific basis for classifying cocaine as a narcotic or with narcotics.
>
> 2. Cocaine is not a physiologically addicting drug in the way that depressant drugs are. People can become dependent on it, as they can coffee and cigarettes. But cocaine does not induce gross tolerance or withdrawal. In American society cocaine may well be less dangerous medically than alcohol and the danger of becoming dependent on cocaine may be less than the danger of becoming dependent on alcohol or tobacco.
>
> And 3. There is considerable medical and scientific opinion that the patterns of cocaine use in America are in no way comparable to the patterns of heroin use. The great majority of cocaine users take the drug occasionally, socially, and by nasal inhalation. Occasional use carries no physical damage, but nasal membrane damage may result from prolonged, excessive use. Excessive use of cocaine in America is rare.
>
> Now the court, however, is advised that cocaine has been classified as a quote, "habit-forming narcotic" by the United States Congress and is considered as such within the context of military law.

## B

We can hardly be critical of the military judge's somewhat confusing instructions in this case, since military justice heretofore has failed to clarify adequately how drug offenses should be punished. The Uniform Code contains no express prohibition of drug abuse;[8] and the Manual for Courts-Martial has not been revised in recent years to keep pace with Federal legislation concerning controlled substances.[9]

Prosecution of drug offenses has been handled in these three ways: (1) Under the first two clauses of Article 134, proscribing "disorders and neglects to the prejudice of good order and discipline in the armed forces" or "conduct of a nature to bring discredit upon the armed forces"; (2) under the third clause of Article 134, which prohibits "crimes and offenses not capital" and, in effect, incorporates other penal provisions of the United States Code; and (3) under Article 92, as a violation of various service regulations concerning drug abuse. See Schlechter, "Charging Cocaine in the Military," 5 AF JAG Rptr. 7 (1978).

■ When the first method is used, the Government must prove that the alleged misconduct prejudiced good order and discipline or was service-discrediting, and, if the trial is by court members, they are so instructed. The applicable maximum punishments are the subject of paragraph 127c of the Manual for Courts-Martial—which includes the Table of Maximum Punishments.

■ When a "crime[ ]and offense[ ]not capital" is alleged, the Government must establish all the elements of the offense—as those elements are defined by whatever Federal penal statute is being incorporated

8. Senator Jepsen recently introduced a Bill which would add to the Uniform Code a punitive Article [§ 3(dd)(1)] concerning controlled substances. See S. 2521 introduced on May 12, 1982, 128 Cong. Rec. S. 4998, 5002.

9. Notice has recently been given of proposed changes in those portions of the Manual which concern drug offenses. See 47 Fed.Reg. 15823 (1982).

pursuant to the third clause of Article 134.[10] That statute will itself specify a maximum punishment; but if the "misconduct [proscribed] is . . . lesser included to another offense listed in the Table or [is] 'closely related' to" a listed offense, the maximum stated in the Table of Maximum Punishments will control—at least, when it is less than the maximum specified in the statute which defines the "crime[ ]and offense[ ]not capital." *United States v. Walter*, 20 U.S. C.M.A. 367, 369, 43 C.M.R. 207, 209 (1971); *United States v. Middleton*, 12 U.S.C.M.A. 54, 30 C.M.R. 54 (1960).

■ When drug offenses are prosecuted as violations of general regulations pursuant to Article 92, the Government must establish the terms of the regulation and prove that the acts of the accused violated those terms. For such offenses, the Table of Maximum Punishments appears to prescribe the applicable ceiling on sentence— namely, dishonorable discharge, total forfeiture of pay and allowances, and confinement for 2 years. However, if the regulation enjoins conduct which already is prohibited by the Code, the violation of the regulation will not increase the punishment otherwise imposable. *United States v. Wal-*

*ter, supra.* Moreover, under the circumstances involved in *United States v. Courtney*, 1 M.J. 438 (C.M.A.1976), our Court held that, in view of the absence of criteria for an accuser to apply in choosing among multiple charging options available to the Government,[11] the punishment otherwise imposable for a drug offense prosecuted as a violation of Article 134 would be limited to the 2 years' confinement which may be adjudged for violating a regulation that prohibited the same misconduct.[12]

### C

In the present case, there is no question that appellant's acts can be punished as disorders and service-discrediting conduct under the first two clauses of Article 134. Indeed, any other result would be inconceivable in light of the serious problems created by drug abuse in the armed forces. *See Drug Abuse in the Military—1981*, Hearing before the Select Committee on Narcotics Abuse and Control, H.Rep., 97th Cong., 1st Sess. (September 17, 1981). The controversy here concerns the maximum punishment imposable—an issue to which we now must turn.

**10.** If that statute has no extraterritorial application, it cannot be relied on under the third clause of Article 134 to punish acts or omissions which occur outside the "United States" as defined in 18 U.S.C. § 5. *United States v. Gladue*, 4 M.J. 1 (C.M.A.1977).

**11.** Prior to our decision in *United States v. Courtney*, 1 M.J. 438 (C.M.A.1976), the practice varied among commands—and frequently within a command—as to whether a given drug offense would be prosecuted under Article 92 or under Article 134, UCMJ, 10 U.S.C. § 892 or 934, respectively. Consequently, servicemembers who engaged in essentially identical conduct might be subject to a substantial discrepancy in the maximum punishment imposable for that conduct. After the Court ruled in *Courtney* that such a situation denied the accused equal protection of the law, service regulations were changed to provide greater guidance in this respect. *See* para. 5-2a(7), Army Regulation 600-50 (October 20, 1977); Article 1151, United States Navy Regulations, 1973; paras. 4-2 and 4-4, Air Force Regulation 30-2 (November 8, 1976), and Figure 4-2 (*id.*, C 1, July 22, 1977). Basically, under these di-

rectives drug abuse involving a "dangerous drug"—

a nonnarcotic drug which is habit-forming or has a potential for abuse because of its stimulant, depressant, or hallucinogenic effect as determined by the Attorney General of the United States as defined in 21 U.S.C. 801 *et seq.*, includes but is not limited to: Amphetamines, barbiturates, lysergic acid diethylamide (LSD), mescalin, 4-metyl-2 demethoxyamphetamine (STP), . . . phencyclidine (PCP)

—is to be punished as a violation of Article 92. Drug abuse involving marihuana or any "narcotic drug"—including but "not limited to: Heroin, cocaine, codeine, methadone, morphine, and opium"—is to be punished as a violation of Article 134.

**12.** The Court was concerned that the unguided discretion to choose among charges would constitute a violation of the accused's equal protection rights. To some extent the premise for the Court's opinion may have been undercut subsequently by the United States Supreme Court's decision in *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

Paragraph 127$c$(1) of the 1969 Manual for Courts-Martial commences with this language:

Applicability and use of Table of Maximum Punishments. The punishment stated opposite each offense listed in the Table of Maximum Punishments is hereby prescribed as the maximum punishment for that offense, and for any lesser included offense if the latter is not listed, and for any offense closely related to either if not listed. If an offense not listed in the table is included in an offense which is listed and is also closely related to some other listed offense, the lesser punishment prescribed for either the included or closely related offense will prevail as the maximum limit of punishment. However, if the offense is closely related to more than one listed offense, the maximum punishment for the most closely related offense shall be used in making this determination.

Offenses not listed in the table and not included within an offense listed, or not closely related to either, are punishable as authorized by the United States Code. Prior to September 1, 1980,[13]—and at the time appellant was convicted—the reference in the Manual was to punishment "authorized by the United States Code (see, generally, Title 18) or the Code of the District of Columbia, whichever prescribed punishment is the lesser"; and similar language appeared in the 1951 version of the Manual for Courts-Martial.

The 1969 version of the Table of Maximum Punishments lists these two categories of drug offenses: (a) "Drugs, habit-forming, wrongful possession, sale, transfer, use or introduction into a military unit, base, station, post, ship or aircraft"; and (b) "Drugs, marihuana, wrongful possession, sale, transfer, use or introduction into a military unit, base, station, post, ship or aircraft." For the former, the maximum punishment is dishonorable discharge, total forfeitures, and 10 years' confinement; for the latter, the confinement is limited to 5 years.

In calculating the ceiling on punishment applicable to wrongful possession, use, transfer, or sale of seconal—which is "habit-forming" but is not a "narcotic"—our Court concluded that a reference in the 1951 Manual's Table of Maximum Punishments to "habit-forming drugs" must be read to mean "habit-forming narcotic drugs." United States v. Turner, 18 U.S.C. M.A. 55, 39 C.M.R. 55 (1968). In light of this interpretation, the President's subsequent reference to "habit-forming drugs" in the 1969 Table of Maximum Punishments must be construed to include only "habit-forming narcotic drugs."

Both at trial and on appeal, appellant has insisted that there is a pharmacological consensus—shared by the Federal Government, see, e.g., 2 Drug Enforcement, Drug Enforcement Administration, U. S. Department of Justice, 19 (Spring, 1975)—that cocaine is not a "narcotic" but a "stimulant." Therefore, cocaine is not included in the category of "habit-forming drugs" listed in the Table of Maximum Punishments. See United States v. Turner, supra. Furthermore, Ettleson also would demand that the "habit-forming" characteristics of cocaine be established at trial by the Government— either by evidence or stipulation. According to this argument, the applicable punishment for appellant's offenses should have been ascertained by determining whether similar crimes were punishable under the United States Code or the District of Columbia Code and, if so, which of these Codes contained the lesser punishment. See Schlechter, supra at 9; United States v. Clifford, 1 M.J. 738 (A.F.C.M.R.1975). Since the District of Columbia Code prescribed a maximum of 1 year's imprisonment for relevant cocaine offenses, see §§ 33–401 $k$, $n$; 33–402 $a$; and 33–423—

---

**13.** By Executive Order 12233, dated September 1, 1980, the Code of the District of Columbia was deleted as an alternate reference for determining the maximum punishment for a disorder or neglect charged under Article 134 and for which the Table of Maximum Punishments is silent. See para. 127$c$, Change 4, Manual for Courts-Martial, United States, 1969 (Revised edition).

which is considerably less confinement than the maximum authorized by the United States Code, *see* 21 U.S.C. §§ 801, *et seq.* —appellant concludes that the maximum punishment for each cocaine offense of which he was convicted could not exceed 1 year.

The Government maintains—and the military judge apparently concluded—that within the contemplation of the Table of Maximum Punishments, cocaine is a "habit-forming narcotic drug" and, therefore, its possession, use, or sale is subject to punishment by up to 10 years' confinement. To this, appellant's initial response is that, even if the Government's position were accepted, classifying cocaine as a "narcotic drug"—whether done by Congress or by the President—would be so arbitrary and capricious in light of the pharmacological consensus to the contrary that he and others

similarly situated would be deprived of their rights to equal protection and due process.

This argument has found little judicial acceptance.[14] "Many courts ... have upheld the classification of cocaine as a ... [narcotic] in the face of arguments that it is not a narcotic." *United States v. Delagarza*, 650 F.2d 1166, 1167 (10th Cir. 1981), *cert. denied*, 452 U.S. 917, 101 S.Ct. 3053, 69 L.Ed.2d 421 (1981). They have reasoned that, in view of the noxious effects of cocaine,[15] legislatures may include it within the same class as pharmacologically defined narcotics for purposes of regulation and punishment. Under this view, "narcotic" is a word of art applied to cocaine by Congress and many state legislatures as a matter of convenience to designate the penalties attached to its use, possession, and sale;[16] so

14. *See, e.g., United States v. Stieren*, 608 F.2d 1135 (8th Cir. 1979); *United States v. Vila*, 599 F.2d 21 (2d Cir. 1979), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *Government of Canal Zone v. Davis*, 592 F.2d 887 (5th Cir. 1979); *United States v. Solow*, 574 F.2d 1318 (5th Cir. 1978); *United States v. Lane*, 574 F.2d 1019 (10th Cir. 1978); *United States v. McCormick*, 565 F.2d 286 (4th Cir. 1977); *United States v. Wheaton*, 557 F.2d 275 (1st Cir. 1977); *United States v. Lustig*, 555 F.2d 737 (9th Cir. 1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978); *United States v. Marshall*, 532 F.2d 1279 (9th Cir. 1976); *United States v. Harper*, 530 F.2d 828 (9th Cir. 1976), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976); *United States v. Foss*, 501 F.2d 522, 530 (1st Cir. 1974); *United States v. Smaldone*, 484 F.2d 311, 319–20 (10th Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974); *United States v. Umentum*, 401 F.Supp. 746, 748 (E.D.Wis. 1975), *aff'd*, 547 F.2d 987 (7th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Brookins*, 383 F.Supp. 1212, 1213–17 (D.N.J.1974), *aff'd*, 524 F.2d 1404 (3d Cir. 1975); *State v. Bonanno*, 384 So.2d 355 (La.1980); *People v. Davis*, 92 Cal. App.3d 250, 154 Cal.Rptr. 817 (1979); *State v. Stitt*, 600 P.2d 671 (Wash.App.1979); *State v. Vernon*, 283 N.W.2d 516 (Minn.1979); *State v. Erickson*, 574 P.2d 1 (Alaska 1978); *People v. Billi*, 90 Misc.2d 568, 395 N.Y.S.2d 353 (Sup.Ct. 1977); *United States v. Mobley*, 12 M.J. 1029 (A.C.M.R.1982); *United States v. King*, 6 M.J. 927, 931–32 (A.F.C.M.R.1979), *pet. denied*, 7 M.J. 214 (1979). *See also United States v. Pring* (9th Cir. Nov. 10, 1981), *cert. denied*, ——

U.S. ——, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *State v. Yu*, 400 So.2d 762 (Fla.1981); *People v. Yettke*, 420 N.E.2d 194 (Ill.App.1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982).

15. These effects are vividly demonstrated by the following statistics from the Centers for Disease Control. Between 1976 and 1980–1981, the rate of cocaine-related emergencies increased from 0.7 to 2.3 per 10,000 emergencies; the rate of cocaine-related deaths increased from 4.5 to 19.1 per 10,000 medical-examiner reports; and the percentage of cocaine-related treatment-programs admissions increased from about 90 in 1975 to about 550 in 1981 per 10,000 admissions. 31 Morbidity and Mortality Weekly Report, Centers for Disease Control, U. S. Department of Health and Human Services, 265–66 (May 28, 1982).

16. Etymologically, this seems wrong, since the term is derived from the Greek word for "benumb" or "stupefy" and implies sedation or analgesia rather than stimulation. But for a long time ... ["narcotic"] has been applied loosely to a great variety of drugs, possibly because numbing is thought of as something like "enabling one to forget one's troubles" and possibly because the most venerable psychoactive drugs—alcohol, opium, and cannabis—in fact often have a sedative effect. The title of von Bibra's book, *Die Narkotischen Genussmittel und der Mensch*, published in 1855, may be translated as *The Narcotic Drugs and Man*, although "Genussmittel" literally means "means of enjoyment" or "luxu-

[i]n law . . . it has been given an artificial meaning. It does not refer, as might be expected, to one class of drugs, each having similar chemical properties or pharmacological effects. It is applied rather to a number of different classes of drugs that have been grouped together for purposes of legal control [17];

and in this context cocaine invariably is included.

Thus, in rejecting an attack on the legislative classification of cocaine as a "narcotic," the Illinois Supreme Court recently observed:

Cocaine and heroin are by far the most expensive and most profitable of the illicit drugs. As such, both heavily attract the criminal element of society. One kilogram of cocaine may cost a wholesaler from $12,000 to $20,000 but has a street value of over a million dollars. (Woods, The Psychopharmacology of Cocaine, 1 Drug Use in America, Problems in Perspective 116, 129–30 (1973).) Moreover, the use of cocaine has increased at an alarming rate as the drug has become regarded by users as the "high status drug." (Peterson, Statement before the Select Committee on Narcotics Abuse and Control of the House of Representatives on Cocaine 1 (1979).) It must be noted that one of the primary purposes of the Act is to "penalize most heavily the illicit traffickers or profiteers of controlled sub-

stances." (Ill.Rev.Stat.1979, ch. 56½, par. 1100.) The State urges that these facts provide a rational basis for treating cocaine more severely than substances in Schedule II which are pharmacologically classified as nonnarcotic.

Second, the State points to the strong correlation between the use of cocaine and the use of heroin and the opiates as a rational basis for the classification. Drs. Fort and Siegel estimated that only 1% of cocaine users also use heroin. However, other studies have reported that 50% of cocaine users also regularly use heroin and that 84% of all heroin users also use cocaine. (Woods, The Psychopharmacology of Cocaine, 1 Drug Use in America, Problems in Perspective 116, 130 (1973).) Another study in 1977 reported that more than half of narcotic overdose deaths involved cocaine. (Welti, Death Caused by Recreational Cocaine Use, 24 J.A.M.A. 2519 (1979).) Although there is a great disparity in the opinions of experts as to the relationship between the use of heroin and the use of cocaine, some percentage of crossover is apparent.

Third, the State points to the potential for harm inherent in the illegal use of cocaine as providing a rational basis for its classification as a narcotic for penalty purposes.

Defendant's experts admit that there is a great divergence of opinion among ex-

ry." Among the drugs . . . [the book] discusses are the stimulants: tobacco, coffee, tea, coca, and mescaline. . . [A] British medical journal in the 1870's [referred] to coca as "a new narcotic and a new stimulant." Freud, more . . . [precise in his usage,] contrasts stimulants like cocaine with narcotics, but he classes cannabis with opium as a narcotic.

While this classification would not be employed today, this designation is far sounder from a pharmacological standpoint than to use "the term ['narcotic'] for cocaine, which numbs only the tongue and palate." It would even be more appropriate "to call alcohol, barbiturates, and tranquilizers narcotics, although, unlike opiates, they are less effective against pain than against anxiety." Of course, this is not done,

since the term narcotic no longer has the vague but morally neutral connotations it

had in the nineteenth century. [Currently,] [i]t is used in public discourse . . . [chiefly] to denounce a drug as a menace to society that must be suppressed. (Something similar has happened to the word addiction, which originally meant simply a habitual inclination.)

L. Grinspoon and J. Bakalar, Cocaine—A Drug and Its Social Evolution 41–42 (footnote) (1976) [hereafter Grinspoon].

17. President's Commission on Law Enforcement and Administration of Justice—The Challenge of Crime in a Free Society, Task Force Report: Narcotics and Drug Abuse, p. 2 (1967). See W. Eldridge, Narcotics and the Law 1 (2d ed. 1967) (" 'Narcotics' is a term of convenience used to designate opium, cocaine, marijuana, and their derivatives, and the many synthetic compounds which produce physiological results similar to those of the natural drugs.")

perts on the potential for harm inherent in the use of cocaine. Animal studies are cited by the State which indicate that the use of cocaine causes a high degree of psychological dependence and tolerance. (Deneau, Self Administration of Psychoactive Substances by the Monkey, a Measure of Psychological Dependence, 16 Pharamcologia 30–48 (1969); Matsuzaki, Effects of Cocaine on the Electrical Activity of the Brain and Cardiorespiratory Functions and the Development of Tolerance in the Central Nervous System, in S. J. Mule, Cocaine: Chemical, Biological, Clinical, Social and Treatment Aspects 149–162 (1976); Post, Clinical Aspects of Cocaine: Assessment of Acute and Chronic Effects in Animals and Man," in S. J. Mule, Cocaine: Chemical, Biological, Clinical, Social and Treatment Aspects 203 (1976).) Other studies involving humans are cited by the State to show that the use of cocaine may cause depression, nervousness, fatigue, sleepiness, hunger, hallucinations, psychosis, psychological dependence and even death. The 1979 issue of the Journal of the American Medical Association states:

"This report again demonstrates that cocaine cannot be regarded as a safe recreational drug despite current belief and legal controversy." Welti, Death Caused by Recreational Cocaine Use, 24 J.A.M.A. 2519, 2522 (1979).

The State also points to the danger inherent in the increase in the practice of smoking coca paste or freebase cocaine. Coca paste is an extraction product made during the manufacture of cocaine from the leaves of the coca bush. The leaves are mashed, and alkali, kerosene and sulfuric acid are added. The white paste is usually sprinkled on tobacco or marijuana and is smoked. Smoking this high potency cocaine sulfate is the equivalent of intravenous injection. Reportedly, such use frequently results in an obsession with coca paste smoking, the appearance of psychotic reactions and paranoid states. (Cohen, Coca Paste and Freebase: New Fashions in Cocaine Use, 9 Drug Abuse and Alcoholism Newsletter, No. 3 (1980).) Freebase cocaine is ordinarily made by the user by dissolving the impure cocaine power in water, adding a strong alkali and extracting the basic cocaine with a volatile solvent. These caustic and volatile chemicals frequently cause home accidents. When this "freebase" is smoked, it reportedly evokes an enormous desire to keep "basing." The effect is identical to intravenous use. "Manic, paranoid or depressive psychosis have been seen. Overdoses can cause death due to cardiorespiratory arrest." Cohen, Coca Paste and Freebase: New Fashions in Cocaine Use, 9 Drug Abuse and Alcoholism Newsletter, No. 3 (1980). See Jeri, The Syndrome of Coca Paste, 10(4) Journal of Psychedelic Drugs 361 (1978); Daltry, Freebase: Can You Smoke Cocaine Without Getting Burnt?, Grassroots Stimulants 7 (1980).

The State additionally argues that the ongoing dispute in the scientific and medical community as to the potential harm inherent in the use of cocaine and the abundance of unresolved questions concerning the effect of cocaine on humans provide a rational basis for its present statutory classification.

We conclude that the reasons presented by the State provide a rational basis to validate the legislature's judgment to classify cocaine with "true" narcotic substances for the purpose of penalty.

*People v. McCarty*, 86 Ill.2d 247, 56 Ill.Dec. 67, 71–72, 427 N.E.2d 147, 151–52 (1981).

D

Even though the President was free to include cocaine with "true" narcotics for purposes of fixing maximum punishments, does the Manual indicate an intent to do so? Our consideration of the history of efforts to regulate drugs suggests an affirmative answer.

Congress took its first step against drugs with the Pure Food and Drug Act of 1906, which made illegal the "interstate shipment of food and soda water containing cocaine or opium and required that medicines containing these drugs be properly labeled."

This Act also placed "the first restrictions on importation of coca leaves." [18] *See* Act of June 30, 1906, Pub.L.No.384, 59th Cong., 1st Sess., 34 Stat. 768. Then in 1909 Congress prohibited the importation and use of opium for other than medicinal purposes. *See* Act of February 9, 1909, Pub.L. No. 221, 60th Cong., 2nd Sess., 35 Stat. 614. In January 1914, this statute—known as the Harrison Narcotic Act—was amended to include cocaine. Also, anyone who produced or distributed opiates or cocaine was required to "register with the . . . government and keep records of all transactions." Those who dealt with the drugs were "required to pay a special tax." [19] *See* Act of January 17, 1914, Pub.L.No.46, 63rd Cong., 2nd Sess., 38 Stat. 275. Interestingly, the "[p]ossession of opiates or cocaine by an unregistered person was not in itself a crime but was [only] evidence of violation of the . . . tax provisions." [20] However, in 1922, this legislation was amended once again—Congress for the first time officially declaring cocaine to be a "narcotic" substance. *See* Act of May 26, 1922, Pub.L.No. 227, 67th Cong., 2nd Sess., 42 Stat. 596. According to the definition [§ 1(a)] adopted by Congress at that time, "[t]he term 'narcotic drug' means opium, *coca leaves, cocaine...*" (Emphasis added). In 1944, the definition of "narcotic drug" was amended [§ 8(a)] to read, "opium, coca leaves, cocaine, isonipecaine." Act of July 1, 1944, Pub.L.No.414, 78th Cong., 2nd Sess., 58 Stat. 721. In the General Provisions Relating to Narcotic Drugs in the Internal Revenue Code of 1954, § 4731(a), 83rd Cong., 2nd Sess., 68A Stat. 557, "narcotic drugs" was defined as

> any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
>
> (1) Opium, isonipecaine, *coca leaves,* and *opiate* ;

> (2) Any compound, manufacture, salt, derivative, or preparation of opium, isonipecaine, *coca leaves,* or *opiate* ;
>
> (3) Any substance (and any compound, manufacture, salt, derivative, or preparation thereof) which is chemically identical with any of the substances referred to in clauses (1) and (2).

(Emphasis supplied).

In turn, "opiate" was defined in the Internal Revenue Code of 1954, § 4731(g), 68A Stat. 558, as

> any drug (as defined in the Federal Food, Drug, and Cosmetic Act; 52 Stat. 1041, section 201(g); 21 U.S.C. 321) found by the Secretary or his delegate, after due notice and opportunity for public hearing, *to have an addiction-forming or addiction-sustaining liability similar to morphine or cocaine.*

(Emphasis supplied.) *See also* Act of March 8, 1948, Pub.L.No.320, § 1, 79th Cong., 2nd Sess., 60 Stat. 38.

The Narcotics Manufacturing Act of 1960, Pub.L.No.86–429, § 3(g)18, 74 Stat. 55, included "[c]ocaine and its salts" in the "basic class of narcotic drug." This Act modified the definition of "opiate," as used in the Internal Revenue Code of 1954, but it still designates as an "opiate" [§ 4(b)] a substance which the Secretary of the Treasury [§ 3(c)]

> found . . . after due notice and opportunity for public hearing, to have an *addiction-forming or addiction-sustaining liability similar to morphine or cocaine* or to be capable of conversion into a drug having such addiction-forming or addiction-sustaining liability, where, in the judgment of the Secretary or his delegate, the relative technical simplicity and degree of yield of such conversion create a risk of improper use of the drug or other substance.

(Emphasis supplied.) In the Comprehensive Drug Abuse Prevention and Control Act of 1970, Congress once again treated cocaine as a "narcotic" for purposes of regulation and punishment. *See* 21 U.S.C. § 802(16).

---

**18.** Grinspoon, *supra* at 41.

**19.** *Id.*

**20.** *Id.*

Not only Congress but also State legislatures were including cocaine within the category of "narcotic drugs."[21] Thus, in 1932 the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Narcotic Drug Act, which "was eventually adopted by all states except California and Pennsylvania and dominated official policy on cocaine, along with the Harrison Act, until 1970."[22] The Uniform Narcotic Drug Act contains these definitions:

(12) "Coca leaves" includes cocaine.

\* \* \* \* \* \*

(14) "Narcotic drugs" means coca leaves opium, cannabis, and every substance neither chemically nor physically distinguishable from them.

(15) "Federal Narcotic Laws" means the laws of the United States relating to *opium, coca leaves,* and other narcotic drugs.

(Emphasis supplied).

In military justice cocaine also has long been thought of as a narcotic—perhaps because it had so frequently been associated with opium and other "true" narcotics in Federal and State legislation. The 1937 edition of Naval Courts and Boards referred specifically to cocaine as "a narcotic substance." *See* § 75, Charge II, specification 5, p. 53. *See also* § 128, p. 125. Moreover, cases often were tried by court-martial on charges which referred to cocaine specifically as "a habit forming narcotic drug," *see, e.g., United States v. Fetch,* 17

C.M.R. 836, 840 (A.F.B.R.1954). It can even be inferred that on at least one occasion our Court equated cocaine with a narcotic. *See United States v. Boyd,* 18 U.S.C.M.A. 581, 40 C.M.R. 293 (1969).

■ In view of this background, we are convinced that, in prescribing the Table of Maximum Punishments, the President contemplated that cocaine would be included in the category of "narcotics" whenever the characteristic of a drug as a "narcotic" might be material in determining applicable limitations on punishment. *See United States v. Turner, supra.*

■ Accordingly, the word "narcotic" in the charges preferred against Ettleson was surplusage, since those charges specified that cocaine was the drug involved; and so the legal effect as to maximum punishment was the same as if that word had been omitted from the allegations and only the word "cocaine" had appeared. Moreover, the military judge's instructions that cocaine was a "narcotic" as a matter of law really did not prejudice appellant with respect to the findings, since, if by exceptions and substitutions the court members had eliminated any reference to "narcotic" from their findings, the accused would still have been guilty of an offense for which the maximum punishment would not have been affected.

■ For purposes of determining an appropriate sentence, it was permissible for

---

**21.** Likewise the international community has displayed its determination to combat the life-threatening effects of cocaine use and has consistently treated cocaine in the same way as opium, as noted by the following:

A series of International Conferences on Opium took place, largely at the urging of the United States government, at Shanghai and The Hague in the years before passage of the Harrison Act. In 1914, 44 nations attending the Third Hague Conference signed The Hague Opium Convention providing for strict restraints on the production, manufacture, and distribution of opiates and cocaine. The United States and a few other countries ratified this convention in 1915, and the rest of the world ratified it in 1919, when it became part of the Versailles Treaty. Since then the international legal machinery has been in

principle as dedicated to the suppression of cocaine as the United States government. A series of treaties culminating in the United Nations Single Convention on Narcotic Drugs of 1961 has amplified and elaborated the control system. The Single Convention regulates the opium poppy, the coca bush, the cannabis plant, and their derivatives, replacing all predecessor treaties. It authorizes use of these drugs only for medical and scientific purposes and permits their cultivation, manufacture, possession, sale, distribution, import, and export only by government agencies or under government licenses, with strict supervision and record-keeping requirements.

Grinspoon, *supra* at 43.

**22.** Grinspoon, *supra* at 42.

the court members to be informed by evidence or through judicial notice that in pharmacological terms cocaine is not a narcotic. However, the military judge's advice to the court members concerning medical opinion on this matter removed any basis for complaint by appellant that he had not been allowed to offer Dr. Weil's expert testimony to the same effect.

### E

The word "habit-forming" is now employed by the President in the Table of Maximum Punishments to describe the drug offenses for which 10 years' confinement is authorized.[23] Indeed, for several decades Manuals for Courts-Martial have contained references to "habit-forming drugs." Thus, in the 1951 Manual the Table of Maximum Punishments contained only one category of drug offenses—namely, "Drugs, habit-forming, or marihuana, wrongful possession or use." *See* para. 127 *c*. Earlier Manuals referred in the Table of Maximum Punishments to the introduction into a command of "a habit forming drug," para. 117*c*, Manual for Courts-Martial, U. S. Army (1949), and Manual for Courts-Martial, United States Air Force (1949), or of "a habit-forming narcotic drug," *see* para. 104*c*, Manual for Courts-Martial, U. S. Army (1928); para. 349, Manual for Courts-Martial, 1921, p. 282; para. 349, Manual for Courts-Martial, 1917, p. 166. We have concluded that omission of the word "habit-forming" from the allegations against Ettleson would have been inconsequential since cocaine was designated by name in the charges.

In this connection, we note that various text books have referred to cocaine as habit-forming. *See Attorney's Text Book of Medicine* (1970). A "cocainist" has been defined as "[a] person addicted to the habitual use of cocaine," *Dorland's Illustrated Medical Dictionary* 319 (24th edition); and "cocainism" as the "[a]ddiction to cocaine;

the cocaine habit; the morbid condition resulting from cocaine addiction." J. Schmidt, *Attorney's Dictionary of Medicine* 178 (1962). The very fact that for regulatory and penal purposes cocaine has long been classified with such well known narcotics as opium and heroin—which are highly addictive—may have encouraged the assumption that cocaine possesses similar qualities. In any event, and whatever may be the pharmacological nature of the drug, there long has existed—and still persists—a widespread belief that cocaine is habit-forming. Thus, in July 1979, Lee I. Dogoloff, Associate Director, Domestic Policy Staff, The White House, stated: [24]

> We also know that cocaine is the most powerfully reinforcing or habit-forming of all abused drugs. Although not physically addictive in the sense that opiates are, studies, such as those undertaken by the University of Chicago, show that the desire to continue using cocaine is remarkably strong if the drug is available.

Long before 1969, when the current Manual for Courts-Martial was promulgated, Federal drug laws had characterized cocaine as "habit-forming" for purposes of establishing warning requirements. *See* 21 U.S.C. § 352(d). Other statutes reveal a similar assumption by Congress as to the characteristics of cocaine, since they refer to drugs which "have an addiction-forming or addiction-sustaining liability *similar to morphine and cocaine.*" 68A Stat. 558; 74 Stat. 55. (Emphasis supplied).

Apparently, cocaine was considered by military authorities to be "a habit-forming drug" and court-martial convictions were obtained on charges which refer to it in this manner. *See United States v. Fetch, supra.* In recent years, the decisions of Courts of Military Review have repeatedly taken the position that cocaine is both a "narcotic" and "habit-forming." *See, e.g., United States v. King,* 6 M.J. 927, 932 n. 7 (A.F.C.

---

23. In the 1969 Manual, the word "habit-forming" is used in the Table of Maximum Punishments, the discussion of Article 134 offenses, and sample specifications. Paras. 127*c*; 213*b*, App. 6*c*, specifications 144–46.

24. *See* Hearings before the Select Committee on Narcotics Abuse and Control, H.Rep., 96th Cong., 1st Sess., p. 34.

M.R.1979), *pet. denied*, 7 M.J. 214 (1979); *United States v. Zenor*, 1 M.J. 918 (N.C.M. R.1976), *aff'd*, 3 M.J. 186 (C.M.A.1977).

While the Manual for Courts-Martial does not seek to specify the meaning of "habit-forming," we are convinced that when the President used this word in the Table of Maximum Punishments to designate a category of offenses subject to a punishment by 10 years' confinement, he intended to include cocaine offenses.

However, even if we adopted a different interpretation of "habit-forming," the practical result would be the same. Offenses "closely related" to an offense listed in the Table of Maximum Punishments are subject to the same punishment authorized for that offense—*see* para. 127*c*, 1969 Manual, *supra; United States v. Mayo*, 12 M.J. 286 (C.M.A.1982). In that event, there is no occasion to turn to the maximum punishment authorized by the United States Code —or, before September, 1, 1980, to the maximum punishment allowed under the District of Columbia Code.

Certainly, the circumstance that for regulatory and penal purposes, Congress and State legislatures often have placed cocaine in the same category with drugs like opium and heroin—which unquestionably are "habit-forming narcotic drugs"—tends to demonstrate a close relationship. Furthermore, we consider that, in ascertaining whether a close relationship exists, we are entitled to consider statutes which were enacted after promulgation of the 1969 Manual but before commission of the offenses being tried.[25] The Federal Controlled Substances Act, which was enacted in 1970 and is paralleled by many State laws, provides the framework at the Federal level for the regulation and punishment of drug offenses. A key feature of that Act is the creation of "five schedules of controlled substances." 21 U.S.C. § 812. The identifying characteristics established for Schedules I and II are these:

(1) Schedule I.—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

(2) Schedule II.—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

(C) Abuse of the drug or other substances may lead to severe psychological or physical dependence.

■ "Drug dependence" is a standard that—upon recommendation of the World Health Organization in 1964—has been used to replace "both the term drug addiction and the term drug habituation." *United States v. Zenor, supra* at 921. The congressional determination that cocaine "may lead to severe psychological or physical dependence" and so belongs on Schedule II, *see* 21 U.S.C. § 812(c), Schedule II(a)(4), virtually constitutes a legislative finding that cocaine is "habit-forming." At the least, it demonstrates that, for purposes of paragraph 127*c* of the Manual, cocaine offenses are "closely related" to offenses involving "habit-forming drugs"; accordingly they are subject to the same maximum punishment listed for the latter in the Table of Maximum Punishments—namely, dishonorable discharge, total forfeiture, and confinement at hard labor for 10 years.

---

**25.** Adopting this approach in determining whether offenses are "closely related" does not present any constitutional problem. *See United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958), which upheld the constitutionality of the Assimilative Crimes Act, 18 U.S.C. § 13, whereunder federal penal law incorporates for certain purposes the state law that may be applicable at the time of the offense, even though that law postdates enactment of the Assimilative Crimes Act. Furthermore, in our view statutes may be considered in determining if offenses are "closely related" even when those statutes have no extraterritorial application and the offenses were committed overseas.

■ We come, therefore, to the ineluctable conclusion that omission of any allegation or finding that cocaine is "habit-forming" would not have affected the maximum punishment imposable in the case at bar.[26] However, just as it is permissible to inform court members about other pharmacological characteristics of cocaine, it is perfectly appropriate to receive evidence as to the "habit-forming" or dependence-inducing characteristics of cocaine.[27] Of course, Ettleson has no valid complaint that the military judge refused to allow Dr. Weil's expert testimony in this regard, since—in a way especially beneficial for appellant—the judge provided to the court members in his instructions information about cocaine's characteristics in inducing drug dependence.

### F

In light of our holding in *United States v. Turner, supra,* that the reference to "habit-forming drugs" in the Table of Maximum Punishments includes a requirement that the drug be a "narcotic," a controlled substance which appears on Schedules I or II [28] will not fit within the category of "habit-forming drugs" listed by the Table unless it also has been defined by Congress as a "narcotic drug." We shall not attempt to determine now whether there are non-narcotic substances listed on the Schedules of the Controlled Substances Act which for some reason should be viewed as so "closely related" to "habit-forming narcotic drugs" that they are subject to the 10 years' confinement authorized for such drugs by the Table of Maximum Punishments. Likewise, we shall not now attempt to determine what "narcotic drugs," if any, are so "habit-forming" as a matter of law that, as with opium, heroin and cocaine, it is unnecessary for the Government to prove this characteristic.[29]

Several years ago, a Court of Military Review made it clear that the terminology employed in the Table of Maximum Punishments with respect to drug offenses is an anachronism. *See United States v. Zenor, supra.* Continuation of that anachronism only tends to produce the confusion evident at the trial level in this case and in a number of others in which we have recently granted review. Obviously, a change of the Manual in this regard—which now seems to be at hand—is long overdue.

### IV

### *Conclusions*

The military judge ruled correctly that the Government had established the chain of custody for the cocaine that was tested in the laboratory. Furthermore, he properly determined that appellant was not entitled to relief as to the request for individual defense counsel.

Because of cocaine's potential to commit harm and regardless of its pharmacological properties, Congress has the power to classify cocaine along with opium and its derivatives as a "habit-forming narcotic drug" for regulatory and penal purposes. The Presi-

---

26. Due process requires that adequate notice be given as to what acts constitute a crime and what the penalty may be. In view of the provisions of the Manual and of Federal penal statutes concerning drug offenses, we have no doubt that appellant was aware that his acts were criminal and were subject to severe punishment.

27. Such evidence would relate primarily to determining an appropriate sentence, although in some instances it might also be minimally relevant in determining whether the conduct was prejudicial to good order or service-discrediting.

28. Schedules I and II include controlled substances which are not "narcotic drug[s]" as defined elsewhere in the Controlled Substances

Act, *see* 21 U.S.C. §§ 802(16) and 841 *b*(1)(B). Moreover, Schedules III, IV and V include some "narcotic" drugs. *Cf.* 21 U.S.C. § 952(a).

29. We observe that marihuana—for which the Manual prescribes a maximum confinement of only 5 years—appears on Schedule I (c)(10) of the Controlled Substances Act. Perhaps some controlled substances which are not "habit-forming narcotic drugs" are so "closely related" to offenses involving marihuana as to be subject to the same maximum punishment under the Table of Maximum Punishments. We also leave this question unresolved in the expectation that a forthcoming change to the Manual for Courts-Martial may moot many of these issues. *See* n.9, *supra.*

dent, in establishing limits of punishment for drug offenses, intended to include cocaine in the category "Drugs, habit-forming." Therefore, in a specification alleging that an offense involves cocaine, the words "habit-forming narcotic" are surplusage and are not to be considered an element which must be proved by the Government. The maximum punishment for offenses involving cocaine is dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for 10 years. Since the rulings and instructions of the military judge were consistent with these principles, we perceive no error prejudicial to appellant.

Accordingly, the decision of the United States Air Force Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.